STATE OF CONNECTICUT *v.* ROBERT LAVIGNE
(AC 17997)

Foti, Landau and Daly, Js.

that the defendant was improperly punished for exercising his constitutional right to a jury trial.

Argued October 27, 1999—officially released April 25, 2000

*Jeremiah Donovan,* special public defender, with whom, on the brief, was *Alix Biel,* law student intern, for the appellant (defendant).

*Robert J. Scheinblum,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *David J. Strollo,* senior assistant state's attorney, for the appellee (state).

*Opinion*

DALY, J. The defendant, Robert Lavigne, appeals from the judgment of conviction, rendered after a trial to the court, of attempt to commit sexual assault in the first degree in violation of General Statutes §§ 53a-70 and 53a-49,[1] and risk of injury to a child in violation of

---

[1] General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person . . . (2) engages in sexual intercourse with another person and such other person is under thirteen years of age and the actor is more than two years older than such person . . . ."

General Statutes § 53a-49 (a) provides: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which

General Statutes (Rev. to 1993) § 53-21.[2] The defendant claims that the court improperly (1) found that there was sufficient evidence to sustain the conviction of attempt to commit sexual assault in the first degree and (2) failed to find that the defendant was not guilty by reason of insanity. We affirm the judgment of the trial court.

The following facts reasonably could have been found by the court. The defendant had been residing for several years with friends, W and I, and their two daughters. During that time, the defendant slept on the couch in the living room of W's and I's one bedroom apartment. On Friday, May 14, 1993, W and I went to Danbury for a weekend fishing tournament, leaving their twenty-one month old daughter and their five month old daughter in the apartment with W's sister, L (the aunt), and the defendant, who was thirty-two years of age.

That same day, the defendant, the aunt and the two children went grocery shopping. When they returned, the aunt put the five month old to sleep in a crib in the bedroom. The twenty-one month old victim turned on the television and began watching cartoons in the living room. The defendant also was in the living room. Soon thereafter, the aunt realized that she did not know how to cook the roast that they had purchased for dinner, so the defendant suggested that she go across the street to a neighbor for help while he watched the children.

would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[2] General Statutes (Rev. to 1993) § 53-21 provides: "Any person who wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that its life or limb is endangered, or its health is likely to be injured, or its morals likely to be impaired, or does any act likely to impair the health or morals of any such child, shall be fined not more than five hundred dollars or imprisoned not more than ten years or both."

Upon the aunt's return, she heard the victim crying "at the top of her lungs." When she did not see the victim in the living room, the aunt looked into the bedroom and saw the victim lying naked on the bed with her legs and feet hanging off of it. The victim's diaper was on the floor and her stomach, side and vagina were covered with semen. The aunt noticed also that the victim's vagina appeared red and irritated, unlike when she had changed the victim's diaper earlier. The defendant was standing one inch or two inches away from the victim's legs and feet. His pants and underwear were around his ankles and his penis was semierect. Upon becoming aware of the aunt's presence, the defendant quickly pulled up his pants and offered as an explanation that he was changing the victim's diaper. The aunt then demanded to know why the defendant's pants had been lowered, to which the defendant insisted again that he was just changing the victim's diaper. Thereafter, the aunt demanded that the defendant leave the premises. When he refused to leave, the aunt locked herself and the children in the bedroom. Approximately one-half hour later, the aunt took both children into the bathroom and washed the victim.

That night, the aunt slept with the children in the bedroom and locked the door. The aunt testified later that she did not telephone the police since there was no telephone in the apartment and, furthermore, she wanted to discuss the matter with her brother first. While changing the victim's diaper the next morning, the child kept pointing to her vaginal area while uttering, "hurt, hurt." That afternoon, W returned briefly from the fishing tournament and took the children to Danbury before the aunt could relate what had transpired.[3]

---

[3] W testified that he thought it was "odd" that the defendant, who was usually friendly, did not say "hello" when he had returned to retrieve the children.

Upon W's return on Sunday, the aunt informed him about Friday's occurrence. W then told I, and they both confronted the defendant, who initially stated that "nothing had happened." The defendant then stated that he carried the victim to the bedroom, was attempting to change her diaper and had drooled on the victim when the aunt entered the room. The defendant ultimately admitted to W, however, that "[he] did molest [the victim]." W and I then ordered the defendant out of the apartment, notified the Meriden police department and the department of children and families, and took the victim to Veteran's Memorial Hospital for an examination.

Meanwhile, the defendant went to the home of W's other sister, J. J already had spoken with her brother and was aware of what had transpired. The defendant told J that he was fearful that W would find him and "beat him up." When asked by J why he had molested the victim, he stated that "his mind just kept on telling him to do it," and that he removed her diaper and "stuck his penis in [the victim's] butt," but when the victim's aunt caught him, he claimed that he was changing the victim's diaper. He then proceeded to consume a whole bottle of gin and threatened to commit suicide by cutting his wrist with a steak knife. J's husband intervened and grabbed the knife without incident. Thereafter, J called for an ambulance, and the defendant was taken to the Veteran's Memorial Hospital emergency room.

Gary Brandl, a detective with the Meriden police department, interviewed the defendant and obtained a written statement from him at the hospital on May 17, 1993. The defendant stated that he heard "voices" telling him to have sex with the victim and that he had "pictures in his mind" of himself "putting his penis inside the child." He stated also that after having these pictures in his mind, "he immediately obtained an erection and immediately began intercourse with the [victim]."

I

The defendant claims first that the court improperly found that there was sufficient evidence from which the court could have concluded beyond a reasonable doubt that the defendant acted with the requisite specific intent to commit the crime of attempt to commit sexual assault in the first degree. We disagree.[4]

"When reviewing a claim of insufficiency of evidence, our task is twofold: 'We first review the evidence presented at trial, construing it in the light most favorable to sustaining the facts expressly found by the trial court or impliedly found by the jury. We then decide whether, upon the facts thus established and the inferences reasonably drawn therefrom, the trial court or the jury could reasonably have concluded that the cumulative effect of the evidence established the defendant's guilt beyond a reasonable doubt.' *State* v. *Jarrett*, 218 Conn. 766, 770–71, 591 A.2d 1225 (1991); *State* v. *Weinberg*, 215 Conn. 231, 253, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990).

"Every element of the crime charged must be established by proof beyond a reasonable doubt. The basic facts underlying the elements of the crime charged, however, may be reasonably inferred by the [fact finder]. *State* v. *Castonguay*, 218 Conn. 486, 507, 590 A.2d 901 (1991). 'If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven

---

[4] We note at the outset that the court orally rendered its decision after hearing evidence on the matter. The court neither issued a written memorandum nor signed a transcript of its oral decision on this issue. Although not fully complying with Practice Book § 4059, now § 64-1, the court did issue a detailed statement of its findings and conclusions in connection with its decision. Because the court's decision is sufficiently detailed and concise, we will review the defendant's claims so as not to exalt form over substance. *Connecticut National Bank* v. *Browder*, 30 Conn. App. 776, 778–79, 622 A.2d 588 (1993).

and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt.' *State* v. *Pinnock*, 220 Conn. 765, 771, 601 A.2d 521 (1992); *State* v. *Grant*, 219 Conn. 596, 604–605, 594 A.2d 459 (1991)." *State* v. *Milardo*, 224 Conn. 397, 402–403, 618 A.2d 1347 (1993).

To convict the defendant of attempt to commit sexual assault in the first degree in violation of §§ 53a-70 and 53a-49 (a) (2), the state must prove beyond a reasonable doubt that the defendant acted with the specific intent to commit sexual assault in the first degree, which, in turn, included the intent to have sexual intercourse and that the defendant took a substantial step in a course of conduct planned to culminate in his commission of the crime. Intent may be inferred from the conduct of the accused and is a determination for the trier of fact. *State* v. *Osborn*, 41 Conn. App. 287, 296, 676 A.2d 399 (1996). That the evidence is circumstantial rather than direct does not diminish the force of that evidence. *State* v. *Brown*, 235 Conn. 502, 510, 668 A.2d 1288 (1995). "The state must prove every essential element of the crime beyond a reasonable doubt and, while the jury may draw reasonable and logical inferences, it may not resort to speculation. *State* v. *Tucker*, [181 Conn. 406, 417–18, 435 A.2d 986 (1980)]; *State* v. *Saracino*, 178 Conn. 416, 419, 423 A.2d 102 (1979)." *State* v. *Green*, 194 Conn. 258, 274, 480 A.2d 526 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 964, 83 L. Ed. 2d 969 (1985).

Likewise, "[w]hat constitutes a substantial step in any given case is a matter of degree and a question of fact for the [trier]. . . . The substantial step must be at least the start of a line of conduct which will lead naturally to the commission of a crime . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Osborn*, supra, 41 Conn. App. 294.

Here, the court heard evidence that the defendant, believing that he was alone in the house with the victim, took her into the bedroom, removed her diaper, lowered his pants and underwear, had sexual contact with her and ejaculated on her. The trier could reasonably have found from this evidence that the defendant intended to compel the victim to engage in sexual intercourse had he not been interrupted by the victim's aunt soon after the assault had begun. Evidence was presented that the victim's aunt had observed "redness" of the victim's labia majora. There was also evidence presented by Gregory Acampora, the physician who had examined the victim at the hospital, that although there was no evidence of vaginal or anal penetration and the victim's vulva appeared "atraumatic," that was not inconsistent with slight penetration to that area. Acampora opined further that a sexually aroused male could achieve climax by rubbing his penis against a child's labia majora. The court reasonably could have found therefrom that the defendant had taken a substantial step toward the commission of the crime of sexual assault in the first degree and that the substantial step evinced the defendant's specific intent to commit the crime. We conclude that there was sufficient evidence for the court to have found proven beyond a reasonable doubt that the defendant had the requisite intent to commit attempt to commit sexual assault in the first degree.

II

The defendant claims finally that the court improperly failed to find him not guilty by reason of insanity. He claims that since he was shown to be unable to resist voices in his mind commanding him to molest the victim, the state failed to present sufficient evidence that he was sane beyond a reasonable doubt.[5] We disagree.

[5] With regard to the determination of the issue of insanity, a signed transcript of the oral conclusions of the court was filed on November 18, 1999.

In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law. General Statutes § 53a-13 (a). "[S]anity . . . is an independent fact and not an element of any existing criminal offense. As to such an independent fact, as with regard to other affirmative defenses, the legislature has the constitutional authority to allocate the burden of proof to the defendant rather than to the state." (Citations omitted.) *State* v. *Joyner*, 225 Conn. 450, 464–65, 625 A.2d 791 (1993).

"The credibility of expert witnesses and the weight to be given to their testimony and to that of lay witnesses on the issue of sanity is determined by the trier of fact. . . . In its consideration of the testimony of an expert witness, the trial court might weigh, as it sees fit, the expert's expertise, his opportunity to observe the defendant and to form an opinion, and his thoroughness. It might consider also the reasonableness of his judgments about the underlying facts and of the conclusions which he drew from them." (Citation omitted; internal quotation marks omitted.) *State* v. *DeJesus*, 236 Conn. 189, 201, 672 A.2d 488 (1996).

Here, evidence was presented that Maria Tupper, a licensed and certified social worker, opined that at the time of the offense, the defendant had a psychotic disorder, was under the instructions of command hallucinations and, while he recognized the wrongfulness of his actions, was unable to control himself and unable to resist the voices commanding him to kill himself. Further testimony was provided, however, by Catherine Lewis, a forensic psychiatrist, who concluded that the defendant was able to appreciate the wrongfulness of

his conduct and did have the capacity to conform his conduct to the requirements of the law.

The record provides adequate support for the court's conclusion that the defendant had failed to establish, by a preponderance of the evidence, that he lacked the substantial capacity, as a result of a mental disease or defect, to control his conduct within the requirements of the law. Consequently, the court reasonably could have concluded that the defendant had failed to satisfy his statutory obligations to prove insanity by a preponderance of the evidence.

The judgment is affirmed.

In this opinion the other judges concurred.