# STATE OF CONNECTICUT *v.* HOWARD WILCOX
## (SC 15916)

McDonald, C. J., and Norcott, Katz, Vertefeuille and Robaina, Js.

442

Argued April 27—officially released September 5, 2000

*Mark Diamond*, special public defender, for the appellant (defendant).

*Christopher T. Godialis*, assistant state's attorney, with whom, on the brief, were *John T. Redway*, state's attorney, and *Timothy J. Liston*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KATZ, J. Following a jury trial, the defendant, Howard Wilcox, was convicted of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A),[1]

---

[1] General Statutes § 53a-92 (a) provides in relevant part: "A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually . . . ."

sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1),[2] attempt to commit sexual assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2)[3] and 53a-70 (a) (1), assault in the third degree in violation of General Statutes § 53a-61 (a) (1),[4] and falsely reporting a motor vehicle theft in violation of General Statutes § 14-198.[5] The trial court rendered judgment in accordance with the jury verdict and sentenced the defendant to a total effective sentence of forty years, execution suspended after thirty-four years.[6]

On appeal,[7] the defendant claims that: (1) the state improperly suppressed exculpatory evidence; (2) the

[2] General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ."

[3] General Statutes § 53a-49 (a) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[4] General Statutes § 53a-61 (a) provides in relevant part: "A person is guilty of assault in the third degree when: (1) With intent to cause physical injury to another person, he causes such injury to such person or to a third person . . . ."

[5] General Statutes § 14-198 provides: "False report. A person who knowingly makes a false report of the theft or conversion of a vehicle to a police officer or to the commissioner shall be fined not more than five hundred dollars or imprisoned not more than six months or both."

[6] The trial court sentenced the defendant to a term of imprisonment of fifteen years for the kidnapping conviction, an additional, consecutive fifteen year term for the sexual assault conviction, a consecutive ten year term, suspended after four years, for the attempted sexual assault conviction and a one year concurrent term for the assault conviction. The trial court also imposed a $500 fine for the false reporting of a theft of a motor vehicle conviction.

[7] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

trial court improperly imposed a fixed term of incarcer-
ation for the kidnapping conviction in violation of Gen-
eral Statutes § 53a-37;[8] and (3) the state failed to present
sufficient evidence that the defendant had committed
first degree kidnapping, first degree sexual assault and
attempted first degree sexual assault. We reject the
defendant's claims and, accordingly, affirm the judg-
ment of conviction.

The jury reasonably could have found the following
facts. During the evening of September 16, 1996, the
victim,[9] walked the short distance from her home in
East Haddam to J.R.'s Cafe in Moodus. The defendant,
with whom the victim was not acquainted, already was
at the bar when she arrived. The victim remained at

[8] General Statutes § 53a-37 provides: "Multiple sentences: Concurrent or
consecutive, minimum term. When multiple sentences of imprisonment are
imposed on a person at the same time, or when a person who is subject to
any undischarged term of imprisonment imposed at a previous time by a
court of this state is sentenced to an additional term of imprisonment, the
sentence or sentences imposed by the court shall run either concurrently
or consecutively with respect to each other and to the undischarged term
or terms in such manner as the court directs at the time of sentence.
The court shall state whether the respective maxima and minima shall run
concurrently or consecutively with respect to each other, and shall state in
conclusion the effective sentence imposed. When a person is sentenced for
two or more counts each constituting a separate offense, the court may
order that the term of imprisonment for the second and subsequent counts
be for a fixed number of years each. The court in such cases shall not set
any minimum term of imprisonment except under the first count, and the
fixed number of years imposed for the second and subsequent counts shall
be added to the maximum term imposed by the court on the first count."

[9] In accordance with General Statutes § 54-86e, and in order to protect
the victim's legitimate privacy interests, the victim's name is not used in
this opinion. Section 54-86e provides: "Confidentiality of name and address
of victim of sexual assault. Availability of information to accused. The name
and address of the victim of a sexual assault under section 53a-70, 53a-70a,
53a-71, 53a-72a, 53a-72b or 53a-73a, or injury or risk of injury, or impairing
of morals under section 53-21, or of an attempt thereof shall be confidential
and shall be disclosed only upon order of the Superior Court, except that
such information shall be available to the accused in the same manner and
time as such information is available to persons accused of other crimi-
nal offenses."

J.R.'s for approximately one and one-half to two hours during which time she had several drinks, danced and conversed with acquaintances. The victim also asked the defendant to dance, tugging his arm to encourage him to join her on the dance floor. After dancing with the victim, the defendant bought the victim a drink and they conversed for a few minutes thereafter.

At approximately 12:30 a.m. on September 17, 1996, the victim left the bar and started walking home. The defendant exited the bar immediately after the victim. As the victim walked down one of the driveways leading away from J.R.'s, the defendant drove up next to her and offered to drive her home. The victim accepted his offer and voluntarily entered the defendant's vehicle. The victim gave the defendant directions to her home, but he failed to turn onto her road as instructed. The victim attempted to exit the moving car by opening the door, but the defendant grabbed her by the arm and pulled her back into the vehicle.

The defendant then drove the victim to a remote area of Cockaponset State Forest, where he pulled her out of the car onto the wet ground[10] and pulled her shorts and underpants down around her ankles. The defendant squeezed his hands around the victim's neck, choking her, and then performed oral sex on her. The defendant also touched the victim's breasts, vagina and buttocks with his hands, mouth and penis. During this period the defendant told the victim that she "deserved it." While the defendant again attempted to perform oral sex on her, the victim managed to kick him away and flee through the woods, pulling up her shorts and underpants as she ran. As the victim ran away, she lost one of her shoes, a sock and her driver's license, which she had kept in her sock. The victim hid for a period of time beneath a tree.

---

[10] Evidence was presented at trial that established that it had been raining periodically over the course of the evening.

Eventually, the victim walked to a house adjacent to the woods where she knocked on the door and asked for help. The victim, who had mud on her clothes and body, and marks around her neck, appeared to have been involved in a struggle. Georgia Marica, one of the occupants of the house, testified that the victim appeared to be terrified. Inside the house, the victim telephoned her father and told him that she had just been raped. Marica notified the police, who arrived shortly thereafter.

In response to the victim's report of a sexual assault, the police conducted a search of the area for any suspects or vehicles. During the early morning of September 17, 1996, the police located the defendant's vehicle approximately 100 feet off a road leading into Cockaponset State Forest. The vehicle's windows were rolled down and the interior was wet due to the rain. A canine search of the vicinity around the vehicle uncovered the victim's shoe, sock and driver's license and the defendant's set of keys.

At approximately 6 a.m. on September 17, 1996, the defendant's girlfriend, Toni Bartlotta, reported the defendant's vehicle as stolen to the state police. Officers went to the defendant's apartment in Deep River in response to the stolen vehicle report and, upon arriving at the apartment, observed Bartlotta cleaning broken glass panes from the front door. The defendant provided the officers with oral and written statements alleging, inter alia, that he had parked his vehicle outside the Old Lyme Tavern in East Lyme the previous evening and later went home with a friend. The defendant further claimed that, when he returned to the Old Lyme Tavern the next morning to retrieve his vehicle, it was missing.

Later the same day, a detective for the state police went to the defendant's home and requested that the defendant go down to the state police barracks in order

to identify his vehicle and further discuss the previous night's events. At the barracks, the defendant told police that in his previous statement he had lied about his vehicle being stolen because he had been out with another woman the previous evening and did not want his girlfriend to find out.

The defendant then provided the police with a second version of the previous evening's events, claiming that he had met the victim at J.R.'s, engaged in conversation with her and offered her a ride home when he saw her walking outside the bar. The defendant further stated that they drove to Cockaponset State Forest, parked the vehicle and began kissing and caressing. The defendant then removed the victim's shirt and shorts and performed consensual oral sex on her in the front seat of the vehicle. The defendant claimed that they then decided to have sexual intercourse and the victim laid down on the wet ground next to the car. The defendant further told police that when he was unable to maintain an erection, the victim became angry and got dressed. The defendant claimed that he had then realized that the victim had taken his car keys and, as the victim started to walk away from the car, he reached out, attempting to recover his keys from her. The defendant alleged that as he reached out, he tripped over a rock and accidentally grabbed the victim's neck. The victim then ran away, and the defendant, unable to find his keys, walked home, breaking the glass in his front door in order to gain entry.

The following day, the defendant contacted the state police and again revised portions of his earlier statement. The defendant provided a third version of the events, claiming that when he left J.R.'s he found the victim passed out in the front seat of his car. The defendant woke up the victim and she agreed to go for a ride with him. The defendant did not alter his previous statements concerning the rest of the evening's events.

The defendant was arrested later that day. Additional facts will be provided as needed.

I

The defendant first claims that the state withheld exculpatory impeachment evidence in violation of *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and thereby deprived him of a fair trial. We conclude that the undisclosed evidence was not material to the defendant's guilt or punishment under the third prong of *Brady* and, therefore, the state's failure to disclose did not violate the defendant's constitutional right to a fair trial.

The following additional facts are relevant to this claim. On January 9, 1997, Michael Dankulich, a victim's advocate, interviewed the victim in order to assess her counseling needs and compensation issues, to provide her with information, and to assist her in obtaining information from the state's attorney's office.[11] Prior to the interview, the assistant state's attorney, Timothy Liston, wrote a brief note to Dankulich, requesting that he clarify with the victim "where and why she got in the car with [the defendant]." Following his interview with the victim, Dankulich wrote a responsive note to Liston, stating that the victim indicated that "she got into [the defendant's] car in the parking lot of the bar, not while walking down the road [and that] when asked why she got in the car she related that she had been drinking and that [James Lawrence] who was in the bar told her that [the defendant] appeared to be OK to accept a ride from. [Lawrence] is a friend of [the]

---

[11] Among its powers, the office of the victim advocate has the authority to evaluate services provided to victims by state agencies, to coordinate services for victims and to recommend changes in policies concerning victims. See General Statutes § 46a-13b et seq. Victim's advocates become involved in criminal cases through a referral from a state's attorney or from their own review of the cases in the state's attorney's office.

 449

victim's." Thereafter, the notes were placed in the state's attorney's file.

On December 23, 1996, the defendant, pursuant to Practice Book §§ 40-11[12] and 40-13,[13] formerly §§ 741 and 743, respectively, filed a request for disclosure and production. In response to the request, the state provided the defendant with numerous documents including police reports, test results and photographs. Over the ensuing months, the state continued to provide relevant documents in compliance with the production request. On January 28, 1998, following the return of the jury's verdict and just prior to sentencing, Liston

---

[12] Practice Book § 40-11 provides in relevant part: "Disclosure by the Prosecuting Authority; Information and Materials Discoverable by Defendant as of Right

"(a) Upon written request by a defendant filed in accordance with Section 41-5 and without requiring any order of the judicial authority the prosecuting authority, subject to Section 40-40 et seq., shall promptly, but no later than forty-five days from the filing of the request, unless such time is extended by the judicial authority for good cause shown, disclose in writing the existence of and allow the defendant in accordance with Section 40-7, to inspect, copy, photograph and have reasonable tests made on any of the following items:

"(1) Exculpatory information or materials . . . .

"(b) In addition to the foregoing, the defendant shall be entitled to disclosure of exculpatory materials in accordance with any applicable constitutional and statutory provisions."

[13] Practice Book § 40-13 provides in relevant part: "Names of Witnesses; Prior Record of Witnesses; Statements of Witnesses Discoverable by the Parties as of Right

"(a) Upon written request by a defendant filed in accordance with Section 41-5 and without requiring any order of the judicial authority, the prosecuting authority, subject to Section 40-40 et seq., shall promptly, but no later than forty-five days from the filing of the request, unless such time is extended by the judicial authority for good cause shown, disclose to the defendant the names and, subject to the provisions of subsections (g) and (h) of this section, the addresses of all witnesses that the prosecuting authority intends to call in his or her case in chief and shall additionally disclose to the defendant:

"(1) any statements of the witnesses in the possession of the prosecuting authority or his or her agents, including state and local law enforcement officers, which statements relate to the subject matter about which each witness will testify . . . ."

turned over to the defendant the notes exchanged between himself and Dankulich, enclosing them in a letter indicating that he recently had found the correspondence in his file.

Immediately thereafter, the defendant filed a motion for a mistrial, pursuant to Practice Book § 42-43,[14] formerly § 887, and a motion for a new trial pursuant to Practice Book § 42-53,[15] formerly § 902. At the hearing on the motion, the defendant argued that the state's failure to disclose the correspondence had deprived him of his rights to due process and a fair trial according to the standard enunciated in *Brady* v. *Maryland*, supra, 373 U.S. 87. The trial court concluded that the defendant had met the first two prongs of the *Brady* standard by demonstrating (1) that the notes, which were eventually turned over on January 28, 1998, had been suppressed, and (2) that, because the notes contained impeachment evidence, they were favorable to him. Nevertheless, because it concluded that the defendant had not estab-

---

[14] Practice Book § 42-43 provides: "Motion for Mistrial; For Prejudice to Defendant

"Upon motion of a defendant, the judicial authority may declare a mistrial at any time during the trial if there occurs during the trial an error or legal defect in the proceedings, or any conduct inside or outside the courtroom which results in substantial and irreparable prejudice to the defendant's case. If there are two or more defendants, the mistrial shall not be declared as to a defendant who does not make or join in the motion."

[15] Practice Book § 42-53 provides: "Motion for New Trial; In General

"(a) Upon motion of the defendant, the judicial authority may grant a new trial if it is required in the interests of justice. Unless the defendant's noncompliance with these rules or with other requirements of law bars his or her asserting the error, the judicial authority shall grant the motion:

"(1) For an error by reason of which the defendant is constitutionally entitled to a new trial; or

"(2) For any other error which the defendant can establish was materially injurious to him or her.

"(b) If the trial was by the court and without a jury, the judicial authority, with the defendant's consent and instead of granting a new trial, may vacate any judgment entered, receive additional evidence, and direct the entry of a new judgment."

lished the materiality of the notes in accordance with the third *Brady* requirement, the trial court denied the motions.

On appeal, the defendant renews his claim that the state suppressed evidence in violation of *Brady*.[16] Specifically, the defendant claims that the state's failure to produce the notes violated his right to the disclosure of exculpatory and impeachment evidence pursuant to General Statutes § 54-86c,[17] Practice Book § 40-11; see

---

[16] The defendant claims that the state deprived him of his rights under the fifth, sixth and fourteenth amendments to the United States constitution, article first, § 8, of the constitution of Connecticut. See *Pointer* v. *Texas*, 380 U.S. 400, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

The fifth amendment to the United States constitution provides in relevant part: "No person shall be . . . deprived of life, liberty, or property, without due process of law . . . ."

The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

The fourteenth amendment to the United States constitution, § 1, provides in relevant part: "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."

Article first, § 8, of the constitution of Connecticut provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be . . . confronted by the witnesses against him . . . . No person shall be . . . deprived of life, liberty or property without due process of law . . . ."

[17] General Statutes § 54-86c provides in relevant part: "Disclosure of exculpatory information or material. (a) Not later than thirty days after any defendant enters a plea of not guilty in a criminal case, the state's attorney, assistant state's attorney or deputy assistant state's attorney in charge of the case shall disclose any exculpatory information or material which he may have with respect to the defendant whether or not a request has been made therefor. If prior to or during the trial of the case, the prosecutorial official discovers additional information or material which is exculpatory, he shall promptly disclose the information or material to the defendant. . . ."

Section 54-86c "reflect[s] the constitutional obligation of a prosecutor to disclose all material evidence favorable to an accused in his possession, an obligation that exists without statutory . . . mandates. *State* v. *Packard*, 184 Conn. 258, 277, 439 A.2d 983 (1981). Therefore, if the state's constitutional duty to disclose exculpatory evidence pursuant to *Brady* has not been violated, then neither has § 54-86c been violated." (Internal quotation marks omitted.) *State* v. *Shannon*, 212 Conn. 387, 395–96 n.6, 563 A.2d 646, cert. denied, 493 U.S. 980, 110 S. Ct. 510, 107 L. Ed. 2d 512 (1989).

footnote 12 of this opinion; and a prosecutor's common-law and constitutional duties to disclose such information.[18]

We begin with the pertinent standard, outlined by *Brady* and its progeny, by which we determine whether the state's failure to disclose evidence has violated a defendant's constitutional rights. "In *Brady* v. *Maryland,* supra, 373 U.S. 87, the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. To establish a *Brady* violation, the defendant must show that (1) the government suppressed evidence, (2) the suppressed evidence was favorable to the defendant, and (3) it was material [either to guilt or to punishment]. *State* v. *White,* 229 Conn. 125, 134–35, 640 A.2d 572 (1994); *Demers* v. *State,* 209 Conn. 143, 150, 547 A.2d 28 (1988)." (Internal quotation marks omitted.) *State* v. *Esposito,* 235 Conn. 802, 813–15, 670 A.2d 301 (1996); see *State* v. *Green,* 194 Conn. 258, 263, 480 A.2d 526 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 964, 83 L. Ed. 2d 969 (1985).

[18] The defendant also claims that the state violated Practice Book § 40-13. See footnote 13 of this opinion. We disagree. Section 40-13 requires the state to disclose to the defendant "any statements of the witnesses . . . which . . . relate to the subject matter about which each witness will testify . . . ." Practice Book § 40-15 defines the term "statement" for the purposes of § 40-13 as "(1) [a] written statement made by a person and signed or otherwise adopted or approved by such person . . . or (2) [a] . . . recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by a person and recorded contemporaneously with the making of such oral statement." Dankulich's *description* of his conversation with the victim, which the victim neither signed nor adopted, was neither a written statement of the victim nor a transcription of such a statement that Dankulich recorded contemporaneously while the victim spoke with him. Accordingly, because the information in the notes was not a statement within the meaning of §§ 40-15 and 40-13, we reject the defendant's claim under those subsections.

The trial court determined that the defendant had satisfied the first two prongs of *Brady*. Therefore, the defendant's claim on appeal challenges only the trial court's assessment of materiality.[19] The defendant claims that the victim's statements in the notes were material to his guilt because they would have permitted him to impeach substantially the victim's testimony. We disagree.

The test for materiality is well established. "The United States Supreme Court . . . in *United States* v. *Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985), [held] that undisclosed exculpatory evidence is material, and that constitutional error results from its suppression by the government, if there is a reasonable

---

[19] Although the state does not dispute that the correspondence was favorable to the defendant, we note that the state does claim, as an alternate ground for affirmance, that it did not suppress the notes within the meaning of the first prong of *Brady*, because it had instituted an "open file" policy, giving the defendant unfettered access to the state's file. During a hearing on August 18, 1997, the trial court noted that "it's the court's understanding that the file is open to the defense and all statements and police reports are likewise, available to the defense." The state's attorney represented at that hearing that he had provided the defendant with a copy of the materials in the file. Because we conclude that the notes are not material under the third prong of the *Brady* standard and, therefore, reject the defendant's claim on that basis, we need not determine whether the trial court properly concluded that the state had suppressed the evidence.

We take this opportunity, however, to discuss briefly our conclusion regarding the use of the open file policy. Although we encourage the use of open file policies and recognize that "this practice may increase the efficiency and the fairness of the criminal process"; *Strickler* v. *Greene*, 527 U.S. 263, 283 n.23, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999); because of the inherent difficulties accompanying so-called open file policies, we caution prosecutors not to substitute an open file policy for a conscientious effort to turn over all required materials to the defendant. Although the policy provides defendants with access to the entire file, in the absence of an accurate index that both parties agree upon, should an issue arise such as in the present case, the ability to determine whether a particular document was in the file, while it was open to the defendant, will be severely compromised. We, therefore, urge parties not to consider implementation of an open file policy as satisfaction of the defendant's discovery requests or the state's constitutional obligation to disclose exculpatory materials.

probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. The United States Supreme Court recently discussed several aspects of materiality under *Bagley* that bear emphasis. See *Kyles* v. *Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). The court explained that a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. Id. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. Id. The United States Supreme Court also emphasized that the *Bagley* test is not a sufficiency of evidence test. Id. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. . . . One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. Id. [434–35]." (Internal quotation marks omitted.) *State* v. *Esposito*, supra, 235 Conn. 814–15; see *State* v. *Ross*, 251 Conn. 579, 595, 742 A.2d 312 (1999). Accordingly, the focus is not whether, based upon a threshold standard, the result of the trial would have been different if the evidence had been admitted. We instead concentrate on the overall fairness of the trial and whether nondisclosure of the evidence was so unfair as to undermine our confidence in the jury's verdict. *United States* v. *Bagley*, supra, 682.

The defendant argues that the notes were material because they contained evidence that he could have

used to impeach further the victim's credibility at trial. In particular, the defendant cites to the inconsistencies, regarding the circumstances under which the victim had entered the defendant's vehicle, between the victim's explanation to Dankulich, her testimony at trial and her statements to other individuals immediately following the assault. We conclude that the impeachment value of the evidence was cumulative and, therefore, insufficient to render the notes material according to the *Brady* and *Bagley* standards.

"It is well established that impeachment evidence may be crucial to a defense, especially when the state's case hinges entirely upon the credibility of certain key witnesses. . . . The rule laid out in *Brady* requiring disclosure of exculpatory evidence applies to materials that might well alter . . . the credibility of a crucial prosecution witness." (Internal quotation marks omitted.) *State* v. *Esposito*, supra, 235 Conn. 815–16. However, "[e]vidence that may first appear to be quite compelling when considered alone can lose its potency when weighed and measured with all the other evidence, both inculpatory and exculpatory. Implicit in the standard of materiality is the notion that the significance of any particular bit of evidence can only be determined by comparison to the rest." (Internal quotation marks omitted.) *State* v. *Shannon*, 212 Conn. 387, 400, 563 A.2d 646, cert. denied, 493 U.S. 980, 110 S. Ct. 510, 107 L. Ed. 2d 512 (1989); see *State* v. *Pollitt*, 205 Conn. 132, 143, 531 A.2d 125 (1987) (materiality determination not made in vacuum).

In the present case, the victim's statement to Dankulich was not substantially inconsistent with her testimony at trial. Additionally, the defendant had sufficient opportunity to cross-examine the victim regarding any inconsistencies in her various statements.

The victim testified at trial that she had been walking down the access road or driveway away from the bar

for approximately two minutes when the defendant drove up next to her and offered her a ride. The victim further testified that the defendant had not forced her into the car, but, rather, that she had accepted the ride and voluntarily entered the defendant's car "[b]ecause it's a small town and it was raining. Everybody in our town . . . basically knows everybody. Nothing ever happens bad in our town." The note from Dankulich indicated, however, that the victim had told him that she had entered the defendant's vehicle in the "parking lot," rather than the driveway, of the bar. Additionally, although at trial the victim testified that she had left the bar intending to walk home, Dankulich's note indicates that she previously had discussed the possibility of receiving a ride from the defendant with Lawrence, her friend, who told her that the defendant was "OK to accept a ride from."

We disagree with the defendant that these differences between the victim's trial testimony and her conversation with Dankulich are sufficient to impeach the victim so substantially as to "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles* v. *Whitley*, supra, 514 U.S. 435. Essentially, the differences between the victim's trial testimony and what she had told Dankulich were: (1) that she had entered the defendant's vehicle while walking down the driveway of the bar rather than in the parking lot; and (2) that she had planned on walking home from the bar, although she told Dankulich that she had asked Lawrence whether the defendant was a person from whom it would be OK to accept a ride. Accordingly, the victim's statements in the note did not substantially differ from her testimony at trial and, therefore, the impeachment value of the information contained in the notes was limited. See *State* v. *Gradzik*, 193 Conn. 35, 42, 475 A.2d 269 (1984) (not every inconsistency is exculpatory); *State* v. *Daugaard*, 32 Conn. App. 483,

492–93, 630 A.2d 96 (1993) (victim's inconsistencies regarding details of location of assault not so contradictory as to constitute *Brady* violation), aff'd, 231 Conn. 195, 647 A.2d 342 (1994).

"The defendant also had ample opportunity to cross-examine the victim as to all details of the assault"; *State* v. *Daugaard*, supra, 32 Conn. App. 493; and regarding any inconsistencies between her trial testimony and her prior conversations. For example, during cross-examination defense counsel asked the victim whether she recalled telling Marica,[20] Carol Flaim, a nurse at Middlesex Hospital, and Derek Allen, a state police detective, that the defendant had forced her into his vehicle. The victim indicated that she did not remember having any such conversations. Additionally, Allen testified that he did not recall the victim stating that the defendant had pulled her into the vehicle. Accordingly, through cross-examination and the submission into evidence of the victim's statement to the police, wherein she indicated that she voluntarily had entered the defendant's car, the defendant had sufficient opportunity to question the victim as to the details of her entry into the defendant's vehicle. See *State* v. *Green*, supra, 194 Conn. 266 (in sexual assault case, "defendant had ample opportunity to cross-examine the victim fully and question her reliability before the jury").

Furthermore, the defendant was able to highlight any inconsistencies between the victim's trial testimony and her previous statements regarding other details of that evening. During cross-examination, defense counsel questioned the victim about whether she had danced and conversed with the defendant at the bar earlier in the evening. The victim testified that she could not remember doing either of those activities at the bar that

[20] Marica was one of the occupants of the house where the victim sought help after the assault.

evening. During cross-examination of Shane Weeks, the bartender at J.R.'s, defense counsel later elicited that the defendant and the victim had engaged in conversation and that the defendant had bought the victim a drink. Additionally, Lawrence testified that the victim had asked the defendant to dance with her.

Therefore, "the ability to impeach [the victim], by prior inconsistent statements was available to the defendant despite the nondisclosure of the [notes] and, in fact, the defendant used that information extensively during his cross-examination of [the victim]. Although the undisclosed material might have contributed further to an attack on the credibility of [the victim], the primary ammunition for that attack was already available to the defendant. The slight additional amount of inconsistent material contained in the [notes] was merely cumulative and, therefore, not significant in a constitutional sense to the defendant's case." *State* v. *Esposito*, supra, 235 Conn. 817; see also *United States* v. *Diaz*, 176 F.3d 52, 108 (2d Cir. 1999) ("suppressed impeachment evidence is not material where [it] merely constitutes 'an additional basis on which to impeach a witness whose credibility has already been shown to be questionable'"); *United States* v. *Amiel*, 95 F.3d 135, 145 (2d Cir. 1996) (same).

Moreover, this was not a case in which "the prosecution's case hinge[d] entirely on the testimony of [the victim] . . . ." *State* v. *White*, supra, 229 Conn. 136–37. Although the victim's testimony obviously was paramount, the prosecution presented independent physical evidence and the testimony of other witnesses that corroborated the victim's version of events and supported the jury's verdict. See *United States* v. *Amiel*, supra, 95 F.3d 146 (independent evidence tied defendant to crime despite nondisclosure of impeachment evidence); *State* v. *Gant*, 231 Conn. 43, 54, 646 A.2d 835 (1994), cert. denied, 514 U.S. 1038, 115 S. Ct. 1404, 131

L. Ed. 2d 291 (1995) (state's case not entirely dependent on witness' testimony and credibility); *State* v. *Daugaard*, supra, 32 Conn. App. 495 (substantial physical evidence and corroborating testimony supporting verdict in addition to victim's testimony). In particular, the testimony of a number of witnesses corroborated the victim's testimony that the defendant had kidnapped and physically and sexually assaulted her. Marica, the resident of the dwelling where the victim sought help, testified that when the victim appeared at her door she had mud on her clothes and knees and "marks around her neck" that looked like someone had "grabbed her right around the neck." Marica described the victim as "very upset, scared, nervous" and "just basically terrified . . . ."

Flaim testified that during her care of the victim at the hospital she had observed "abrasions on [the victim's] extremities" and "around her neck." Flaim explained that the abrasion around the victim's neck looked like "a new bruise."

Valerie I'Anson, the emergency room physician who treated the victim, noted the victim's emotional state as "very distressed." She also described in detail the bruises around the victim's neck and explained that some of the bruises were small rings caused by blood vessels that had ruptured under pressure and were attributable to compression of the neck area. During her examination of the victim, she also noticed a large abrasion on the victim's elbow and "multiple cuts and bruises over both lower extremities." Additionally, I'Anson testified that the victim had mulch and other debris around the entrance to her vagina and concluded that these observations were consistent with the version of events that the victim had provided. Her diagnosis was that the victim had been sexually assaulted.

Sergeant Marcia Youngquist of the Connecticut state police also described the victim's physical appearance

at the hospital. Youngquist explained that the victim's eyes were bloodshot and that blood blisters and red circles vented her entire neck. Youngquist also testified that the victim had bruises and scratches on her knees and arms that were consistent with a physical altercation.

In addition to the descriptions of the physical evidence supporting the victim's version of events, police found the defendant's car off a road leading into Cockaponset State Forest, the place that the victim had described as the location of the assault. The police also recovered the victim's sock, shoe and driver's license in the vicinity, all of which corroborate her description of fighting off the defendant and running through the woods. Furthermore, the defendant's statement to police and his later revisions of the statement cast into doubt the truth and accuracy of his explanation of the evening's events. Although the credibility of the victim in sexual assault cases is often critical because "such offenses are seldom undertaken in public view or in the presence of witnesses"; *State* v. *Green*, supra, 194 Conn. 267; we cannot say that the slight additional impeachment value of the information contained in the notes substantially undermined our confidence in the jury's verdict.

Finally, the information provided by the victim to Dankulich as described in the notes was of limited value. The contents of the notes simply relate to the circumstances under which the victim had entered the defendant's vehicle. Although the victim previously had told some individuals that the defendant had forced her into the car, at trial she admitted to having entered the defendant's car voluntarily. The contents of the note regarding her discussions with Lawrence about whether it was safe for her to accept a ride from the defendant simply provided further evidence of a fact that the vic-

tim already had admitted—that she voluntarily had accepted a ride and entered the defendant's vehicle.

The defendant also intimated at oral argument that the fact that the victim had asked Lawrence whether she could safely accept a ride from the defendant suggests that she had consented not only to entering the defendant's vehicle but also to a sexual encounter with him. We reject the defendant's insinuation that either the victim's inquiry of Lawrence or her decision to accept a ride from the defendant demonstrated that she also consented to the defendant's sexual advances. Moreover, we note that the victim's question to Lawrence regarding whether the defendant was "safe" may have demonstrated the opposite, that is, that the victim did not want any sexual contact with the defendant and even inquired about him with a trusted acquaintance to ensure that this did not occur.

Additionally, the defendant elicited other testimony at trial regarding the defense theory that the victim had consented to having sex with the defendant. Therefore, the additional information contained in the notes that the defendant claims supports this theory would have been cumulative. For example, Weeks testified during cross-examination that he had observed the victim and the defendant conversing with a larger group of people at the bar. Additionally, Lawrence testified that the victim had tugged the defendant's arm and encouraged him to dance with her. He also testified that the defendant and the victim had spoken with each other briefly. Finally, Lawrence stated that the defendant had bought the victim a drink, which she accepted, and that they spoke for a few minutes thereafter. Accordingly, the defendant, attempting to support the defense theory of consensual sex, elicited testimony at trial demonstrating that he and the victim had interacted at the bar. The victim's inquiry of Lawrence that she relayed to Dankulich would have added little to this theory.

Accordingly, we conclude that the information con-
tained in the notes was not material under the third
prong of *Brady*.

II

The defendant also briefly claims on appeal that the
trial court improperly imposed a fixed, rather than an
indeterminate, term of imprisonment for the kidnapping
conviction in violation of § 53a-37.[21] See footnote 8 of
this opinion. Because the defendant failed to preserve
this claim in the trial court and has not requested review
under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d
823 (1989) (providing review of unpreserved claims of
constitutional error if certain requirements met); or
under the plain error doctrine; see Practice Book § 60-
5; *State* v. *Woods*, 250 Conn. 807, 814–15, 740 A.2d 371
(1999); we decline to review the defendant's challenge
to his sentence. Nevertheless, we note that, pursuant
to General Statutes § 53a-35a,[22] the indeterminate sen-

---

[21] Specifically, the defendant claims that because the sentence for the
kidnapping conviction was the first of several consecutive sentences, the
trial court was required to impose a minimum and maximum sentence for
that conviction.

[22] General Statutes § 53a-35a provides: "Imprisonment for any felony com-
mitted on or after July 1, 1981: Definite sentences; terms authorized. For
any felony committed on or after July 1, 1981, the sentence of imprisonment
shall be a definite sentence and the term shall be fixed by the court as
follows: (1) For a capital felony, a term of life imprisonment without the
possibility of release unless a sentence of death is imposed in accordance
with section 53a-46a; (2) for the class A felony of murder, a term not less
than twenty-five years nor more than life; (3) for a class A felony other than
murder, a term not less than ten years nor more than twenty-five years; (4)
for the class B felony of manslaughter in the first degree with a firearm
under section 53a-55a, a term not less than five years nor more than forty
years; (5) for a class B felony other than manslaughter in the first degree
with a firearm under section 53a-55a, a term not less than one year nor
more than twenty years, except that for a conviction under section 53a-59
(a) (1), 53a-59a, 53a-70a, 53a-94a, 53a-101 (a) (1) or 53a-134 (a) (2), the term
shall be not less than five years nor more than twenty years; (6) for a class
C felony, a term not less than one year nor more than ten years, except
that for a conviction under section 53a-56a, the term shall be not less than
three years nor more than ten years; (7) for a class D felony, a term not
less than one year nor more than five years, except that for a conviction

tencing requirements the defendant cites do not apply to convictions rendered after July 1, 1981, when the legislature instituted determinate sentencing for felony convictions. Accordingly, the trial court was required to impose a determinate sentence for all of the defendant's convictions and, in fact, complied with this requirement.

## III

Finally, the defendant claims that the evidence presented at trial was insufficient to support the jury's finding of guilt for the kidnapping, sexual assault by cunnilingus and attempted sexual assault by vaginal penetration counts. We disagree.

"In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *DeCaro*, 252 Conn. 229, 239, 745 A.2d 800 (2000).

Additionally, "[a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all

under section 53a-60b or 53a-217, the term shall be not less than two years nor more than five years, for a conviction under section 53a-60c, the term shall be not less than three years nor more than five years, and for a conviction under section 53a-216, the term shall be five years; (8) for an unclassified felony, a term in accordance with the sentence specified in the section of the general statutes that defines the crime."

possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) Id., 240.

Finally, "[w]e do not sit as a thirteenth juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . Rather, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . *State* v. *Henning*, 220 Conn. 417, 420, 599 A.2d 1065 (1991). This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Tomasko*, 238 Conn. 253, 258, 681 A.2d 922 (1996).

A

The defendant claims there was not enough evidence to support his conviction of kidnapping in the first degree because the state failed to produce sufficient evidence of the restraint element of kidnapping. Essentially, the defendant contends that any evidence that he restrained the victim was incidental to the sexual assault and, therefore, insufficient for a separate charge of kidnapping. We disagree.

A person is guilty of kidnapping in the first degree, pursuant to General Statutes § 53a-92 (a) (2) (A), if "he abducts another person and . . . restrains the person abducted with intent to . . . inflict physical injury upon him or violate or abuse him sexually . . . ." Gen-

eral Statutes § 53a-91 (2) defines "abduct" as "restrain[ing] a person with intent to prevent his liberation by either (A) secreting or holding him in a place where he is not likely to be found, or (B) using or threatening to use physical force or intimidation." The term "restrain" is also defined in § 53a-91 (1) as "restrict[ing] a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent."

The defendant essentially urges us to preclude a conviction for kidnapping where restraint of the victim was incidental to a sexual assault. We previously have considered and rejected the defendant's argument on a number of occasions. "In *State* v. *Chetcuti*, 173 Conn. 165, 170, 377 A.2d 263 (1977), we noted that the legislature had not seen fit to merge the offense of kidnapping with other felonies, nor impose any time requirements for restraint, nor distance requirements for asportation, to the crime of kidnapping." *State* v. *Amarillo*, 198 Conn. 285, 304–305, 503 A.2d 146 (1986); see *State* v. *Gomez*, 225 Conn. 347, 350–51, 622 A.2d 1014 (1993). "[W]here the elements of two or more distinct offenses are combined in the same act, prosecution for one will not bar prosecution for the other. *State* v. *Dubina*, [164 Conn. 95, 100, 318 A.2d 95 (1972)]; *State* v. *Fico*, 147 Conn. 426, 430, 162 A.2d 697 [1960]. *State* v. *Chetcuti*, supra, 169. Where the intent required to constitute kidnapping in the first degree is present, the fact that the perpetrator's underlying motive for the detention is the consummation of [sexual assault] . . . does not preclude a conviction for kidnapping. *State* v. *Lee*, [177 Conn. 335, 344, 417 A.2d 354 (1979)]." (Internal quotation marks omitted.) *State* v. *Amarillo*, supra, 305; see *State* v. *DeWitt*, 177 Conn. 637, 641, 419 A.2d 861 (1979).

"The proper inquiry is not whether the kidnapping was incidental to the sexual assault, but whether the restraint was accomplished with the requisite intent to constitute kidnapping, as well as the state of mind required for sexual assault. Whether the essential elements of kidnapping are proved beyond a reasonable doubt is a question for the jury. *State* v. *Lee*, supra, [177 Conn.] 343. The analysis, therefore, is not simply transactional. A defendant may be convicted of two crimes that derive from the same conduct as long as the state [is] able to prove, beyond a reasonable doubt, all of the essential elements of each crime." (Internal quotation marks omitted.) *State* v. *Amarillo*, supra, 198 Conn. 305.

In the present case the state presented evidence that the defendant forcibly grabbed the victim's arm in order to prevent her from exiting the vehicle. The state also presented evidence that the defendant restrained the victim in the woods and that the victim was required to kick the defendant and struggle with him in order to free herself. The jury was entitled to believe the testimony of the victim. Accordingly, on these facts, the jury reasonably could have found the restraint and intent elements necessary to support a conviction for kidnapping in the first degree.

B

The defendant also argues that there was insufficient evidence to support his conviction of sexual assault in the first degree by cunnilingus because the state failed to produce any evidence of penetration. We reject the defendant's claim.

Pursuant to General Statutes § 53a-70 (a) (1), a defendant is guilty of sexual assault in the first degree if he "compels another person to engage in sexual intercourse by the use of force . . . or by the threat of use of force . . . which reasonably causes such person to

fear physical injury . . . ." General Statutes § 53a-65 (2) defines "sexual intercourse" as including "vaginal intercourse, anal intercourse, fellatio or cunnilingus . . . ." This court previously has defined "cunnilingus" as the " 'stimulation of the vulva or clitoris with the lips or tongue.' " *State* v. *Kish*, 186 Conn. 757, 764, 443 A.2d 1274 (1982). Although evidence of penetration is required for vaginal intercourse, anal intercourse and fellatio,[23] "penetration is not an essential element of the crime [of sexual assault in the first degree] where cunnilingus is charged." Id., 765; see *State* v. *Storlazzi*, 191 Conn. 453, 463–64, 464 A.2d 829 (1983). Accordingly, the state was not required to present evidence of penetration to support the charge of first degree sexual assault by cunnilingus.

The victim testified at trial that after the defendant choked her, he put his mouth on her vagina and his tongue into her vagina. Additionally, the victim testified that the defendant later put his mouth on her vagina again and that during both of these periods she attempted to fight him off. The victim also stated that the defendant told her that if she "didn't shut up" he would continue performing those acts. On the basis of this testimony, the jury reasonably could have concluded that the defendant compelled the victim to engage in cunnilingus by the use of force or the threat of the use of force in violation of § 53a-70 (a) (1). See *State* v. *Kish*, supra, 186 Conn. 766. Consequently, there was sufficient evidence to support the jury's verdict that the defendant committed first degree sexual assault by cunnilingus.

[23] General Statutes § 53a-65 (2) provides in relevant part: "Penetration, however, slight, is sufficient to complete vaginal intercourse, anal intercourse or fellatio and does not require emission of semen. . . ." The definition specifically excludes cunnilingus from the types of sexual intercourse requiring evidence of penetration.

## C

The defendant's final argument on appeal is that there was insufficient evidence to support his conviction for attempted sexual assault in the first degree by vaginal intercourse. We conclude that sufficient evidence was presented to support the jury's finding.

"Under [§] 53a-49 (a) (2), [a] person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime he . . . intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime. The act or acts must be something more than mere preparation for committing the intended crime; they must be at least the start of a line of conduct which will lead naturally to the commission of a crime which appears to the actor at least to be possible of commission by the means adopted. . . . Furthermore, the actor's intent can be inferred from his or her verbal or physical conduct and the surrounding circumstances. . . . [T]he attempt is complete and punishable, when an act is done with intent to commit the crime, which is adapted to the perpetration of it, whether the purpose fails by reason of interruption . . . or for other extrinsic cause." (Citations omitted; internal quotation marks omitted.) *State* v. *Anderson,* 211 Conn. 18, 27, 557 A.2d 917 (1989).

In the present case, we conclude that the jury reasonably could have found that the defendant intentionally engaged in conduct that amounted to a substantial step in the commission of sexual assault in the first degree by vaginal intercourse. The victim testified at trial that the defendant removed her shorts and underwear and then choked her around the neck. The victim also testified that the defendant had touched her vagina with his

hands and penis, and that when she turned over as she was trying to get away, he "jumped back" on top of her and did not have his pants on. The victim further testified that the defendant had touched her buttocks with his genital area, and that after he attempted to perform cunnilingus on her for a second time, she managed to kick him and run away.

The jury reasonably could have concluded from this course of conduct that the defendant had intended to engage in vaginal and anal intercourse with the victim using his penis and hand and that his plan had been thwarted only because the victim had managed to fight him off and flee. Although "mere preparation" is insufficient to constitute a substantial step toward perpetration of a crime, the defendant's conduct in the present case advanced well beyond mere preparation, and the jury reasonably could have concluded that the defendant's actions in removing the victim's shorts and underwear, removing his own pants, and touching the victim's vagina and buttocks with his hands and penis constituted "a substantial step strongly corroborative of his criminal purpose." *State* v. *Lapia,* 202 Conn. 509, 516, 522 A.2d 272 (1987); see *State* v. *Lavigne,* 57 Conn. App. 463, 470, 749 A.2d 83 (2000) (defendant's acts of taking victim into bedroom, removing victim's diaper, lowering his own pants and underwear, and having sexual contact with victim constituted substantial step toward commission of sexual intercourse interrupted only when victim's aunt entered room). Accordingly, we conclude that sufficient evidence existed to support the defendant's conviction of attempted sexual assault in the first degree by vaginal intercourse.

The judgment is affirmed.

In this opinion NORCOTT, VERTEFEUILLE and ROBAINA, Js., concurred.

MCDONALD, C. J., dissenting. I disagree with the majority's conclusion that the prosecution's failure to turn over the victim's statements does not require a new trial. The majority finds that the statements were not material.

I recognize that there may be strong circumstantial evidence that the victim did not consent to sexual activity with the defendant. The crucial evidence supporting the defendant's conviction, however, was the victim's direct testimony that she did not consent to any sexual activity with the defendant. She was the crucial witness for the state.

The statements were documented in a January 9, 1997 interview in which a victim's advocate asked the victim, at the request of the state's attorney, when, where and why she got into the car with the defendant. A note from the victim's advocate to the state's attorney reported: "[The victim] indicated that she got into [the defendant's] car in the parking lot of the bar, not while walking down the road [and] when asked why she got in the car, she related that she had been drinking and that [her friend, James Lawrence] who was in the bar, told her that [the defendant] appeared to be OK to accept a ride from."

The statements differ from the victim's testimony at trial in 1997, that she had been walking home from the bar when the defendant drove up to her on the road and offered her a ride. It also contradicts other statements that she had made concerning how she came to be in the defendant's car. On the night of the alleged incident, September 16, 1996, the victim gave Detective Derek Allen of the Connecticut state police a sworn statement. The victim told Allen that she had left the bar and was walking along the road when the defendant pulled over and asked her if she wanted a ride. She then accepted his offer. That same night, the victim

was taken to the hospital and treated by Valerie l'Anson, an emergency room physician. l'Anson testified that the victim said that after leaving the bar and walking down the road, the defendant forced her into his car.

At trial, the victim also testified that she could not remember whether she had talked, danced or accepted a drink from the defendant while at the bar. There was, however, testimony from Shane Weeks, the bartender, and from Lawrence, the victim's friend, that indicated that she had talked, danced and accepted a drink from the defendant. The jury was, however, unaware of any evidence that Lawrence had told the victim at the bar that the defendant was "OK" to give her a ride home. The victim and Lawrence were not questioned about this conversation at the trial.

"It is well established that impeachment evidence may be crucial to a defense, especially when the state's case hinges entirely upon the credibility of certain key witnesses. . . . The rule laid out in *Brady* [v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)] requiring disclosure of exculpatory evidence applies to materials that might well alter . . . the credibility of a crucial prosecution witness." (Internal quotation marks omitted.) *State* v. *Esposito*, 235 Conn. 802, 815–16, 670 A.2d 301 (1996).

The majority finds that the statements would have been "cumulative" because there was other evidence at trial to impeach the victim's testimony. While this evidence may have impeached the victim at trial, I disagree that the impeachment evidence contained in the interview was cumulative. The statements were made shortly before trial to the prosecutor's representative and were not the same kind of evidence for impeachment as the prior statements as they contained yet another version of the events. See *State* v. *Floyd*, 253 Conn. 700, 746–47 n.32, 756 A.2d 799 (2000), citing

*United States* v. *Cuffie*, 80 F.3d 514 (D.C. Cir. 1996). The statements could have been "the last straw [that broke] the . . . camel's back . . . ." C. Dickens, Dombey and Son (1848) c. 2.

The defendant's right to have his guilt determined by a jury is paramount and the statements might have impacted the jury's assessment of the victim's testimony. The majority rejects the defendant's argument as to the effect of the statements upon the victim's testimony but we should be mindful that it is not our function to pass on credibility or find facts—that responsibility belongs exclusively to the jurors "as the sole triers of fact and credibility . . . ." (Internal quotation marks omitted.) *State* v. *Provost*, 251 Conn. 252, 256, 741 A.2d 295 (1999); *State* v. *Pratt*, 235 Conn. 595, 604, 669 A.2d 562 (1995).

I would conclude the statements "could reasonably [have been] taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles* v. *Whitley*, 514 U.S. 419, 435, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995).

Accordingly, I dissent.