STEFON MORANT *v.* COMMISSIONER OF
CORRECTION
(AC 28990)

Lavine, Beach and Borden, Js.

Argued February 3—officially released September 22, 2009

*Lisa A. Vanderhoof*, special public defender, for the appellant (petitioner).

*Harry Weller*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Christopher T. Godialis*, supervisory assistant state's attorney, for the appellee (respondent).

BORDEN, J. The petitioner, Stefon Morant, appeals from the judgment of the habeas court denying his amended petition for a writ of habeas corpus. The petitioner contends that the court improperly concluded that at his criminal trial (1) there was no violation of *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and (2) he received effective assistance of counsel. We affirm the judgment of the habeas court.

The following facts and procedural history are relevant to the petitioner's claims. In 1994, the petitioner was convicted, following a jury trial, of two counts of felony murder in violation of General Statutes (Rev. to 1989) § 53a-54c. In *State* v. *Morant,* 242 Conn. 666, 667, 701 A.2d 1 (1997), our Supreme Court affirmed the judgment of conviction and determined that the jury reasonably could have found the following facts.

"In 1990, the [petitioner] and Scott Lewis were partners engaged in the sale of drugs from a Clay Street house . . . in New Haven. As part of this drug operation, Ricardo Turner stored drugs and cash in his second floor apartment at 634 Howard Avenue, New Haven. During the night of October 10 and the early morning hours of October 11, 1990, the [petitioner] and Lewis were at the Clay Street house and discussed the possibility that Turner might take the money and leave. Ovil Ruiz and several other individuals who sold drugs for the [petitioner] and Lewis were also present at the Clay Street house during this discussion.

"Two handguns, a .357 caliber and a .38 caliber, were stored in the house. In the early morning hours of October 11, 1990, either the [petitioner] or Lewis told Ruiz to get the guns, and Ruiz gave the guns to Lewis. The [petitioner], Lewis and Ruiz then proceeded to travel in Lewis' automobile to Turner's apartment on Howard Avenue. On the way, the [petitioner] stated, 'whatever

happens, you know, keep it between us.' At the apartment, the [petitioner] and Lewis exited the automobile and Ruiz got into the driver's seat. Ruiz then waited in the car while the [petitioner] and Lewis went inside. When the two of them entered the apartment house, the [petitioner] was carrying the .38 caliber handgun and Lewis was carrying the .357 caliber handgun.

"The [petitioner] and Lewis forced their way into Turner's apartment. They were in the apartment for thirty minutes when, shortly after 4 a.m., they fatally shot Turner and his roommate, Lamont Fields. . . . One bullet passed through the floor and punctured a waterbed in the apartment below. All of the bullet fragments later recovered by police had been fired from a .357 caliber handgun.

"The [petitioner] and Lewis then ran out of the apartment, down the stairs, and into the waiting car. The [petitioner] took from the apartment a bag that contained money, and Lewis took another bag that contained several ounces of cocaine. As they drove away from the scene, Lewis asked the [petitioner] whether the [petitioner] thought he, Lewis, had killed Turner and Fields. The [petitioner] responded, 'whatever happened, happened.'

"[On January 16, 1991], the [petitioner] gave a statement to police in which he admitted that he was with Lewis during the early morning hours of October 11, 1990. He stated that Lewis was taking him home when Lewis stopped on Howard Avenue near the victims' apartment. The [petitioner] stated that Lewis said 'he had to take care of some business' and would be right back, and that Lewis then entered the apartment building while the [petitioner] waited in the car. The [petitioner] further stated that Lewis was perspiring when he came running from the apartment building to the car five or ten minutes later.

"The [petitioner] also told police that Lewis sold narcotics and that, when he and Lewis stopped on Howard Avenue, he thought Lewis was going to take care of some drug-related business. The [petitioner] stated that the next day he learned that there had been a murder on Howard Avenue, and that a few days later, Lewis told the [petitioner] that Lewis 'did what [he] had to do' because one of the victims had owed Lewis 'a couple dollars.' The [petitioner] further stated that at some later time he observed Lewis throw the gun that Lewis had used to commit the murders into the Mill River under the Chapel Street Bridge in New Haven." Id., 668–70.

Following his unsuccessful direct appeal, the petitioner filed a petition for a new trial on the basis of newly discovered evidence. The petition was denied by the trial court,[1] and this court affirmed the denial. *Morant* v. *State*, 68 Conn. App. 137, 802 A.2d 93, cert. denied, 260 Conn. 914, 796 A.2d 558 (2002). Thereafter, in October, 2006, the petitioner filed this amended petition for a writ of habeas corpus, claiming that he is entitled to a new trial because, at his criminal trial, the state had withheld material evidence in violation of *Brady* v. *Maryland*, supra, 373 U.S. 83, and that his trial counsel was ineffective for failing to present certain evidence.[2] After a trial, the habeas court denied the petition for a writ of habeas corpus. The petitioner then requested certification to appeal, which the court granted. This appeal followed.

[1] The petitioner's petition for a new trial was amended several times, and separate counts of the petition were heard and denied by two different judges, *Blue, J.*, and *Hon. William L. Hadden, Jr.*, judge trial referee.

[2] In his petition for a writ of habeas corpus, the petitioner also asserted a claim of actual innocence and a claim that Detective Vincent Raucci of the New Haven police department and Ruiz gave perjured testimony at the petitioner's criminal trial, both of which were rejected by the habeas court. Because these claims are not raised or briefed on appeal, they are deemed abandoned. See *State* v. *Ouellette*, 110 Conn. App. 401, 407 n.1, 955 A.2d 582, cert. granted on other grounds, 289 Conn. 951, 961 A.2d 417 (2008).

# I

## *BRADY* VIOLATION

The petitioner first claims that the court improperly concluded that there was no *Brady* violation at his criminal trial. Specifically, he contends that the testimony of two detectives, Detective Sergeant Michael Sweeney and Detective Joseph Pettola, who were allegedly unknown to the petitioner at the time of his trial, undermines the outcome of his criminal trial because such testimony puts into question the reliability and truthfulness of the testimony of Ruiz and Detective Vincent Raucci of the New Haven police department, two of the state's key witnesses. The respondent, the commissioner of correction, argues that the petitioner's *Brady* claim is barred by the doctrine of collateral estoppel and, in the alternative, that such evidence is not material. We agree with the respondent that the evidence is not material; therefore, we need not address the respondent's first argument.

"Whether the petitioner was deprived of his due process rights due to a *Brady* violation is a question of law, to which we grant plenary review. . . . The conclusions reached by the [habeas] court in its decision to dismiss the habeas petition are matters of law, subject to plenary review. . . . Thus, [w]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct . . . and whether they find support in the facts that appear in the record." (Internal quotation marks omitted.) *Hoskie* v. *Commissioner of Correction,* 110 Conn. App. 845, 847–48, 956 A.2d 611, cert. denied, 289 Conn. 950, 960 A.2d 1037 (2008).

"In *Brady* v. *Maryland,* supra, 373 U.S. 87, the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material

either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. To establish a *Brady* violation, the defendant must show that (1) the government suppressed evidence, (2) the suppressed evidence was favorable to the defendant, and (3) it was material [either to guilt or to punishment]." (Internal quotation marks omitted.) *State* v. *Wilcox*, 254 Conn. 441, 452, 758 A.2d 824 (2000).

Evidence that is not disclosed is suppressed for *Brady* purposes even when it is "known only to police investigators and not to the prosecutor." *Kyles* v. *Whitley*, 514 U.S. 419, 438, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). In addition, evidence is favorable if it is either exculpatory or impeaching. See, e.g., *Strickler* v. *Greene*, 527 U.S. 263, 281–82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). Finally, evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States* v. *Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).

"A reasonable probability is a probability sufficient to undermine confidence in the outcome. The United States Supreme Court [has] discussed several aspects of materiality under *Bagley* that bear emphasis. See *Kyles* v. *Whitley*, [supra, 514 U.S. 434]. The court explained that a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. . . . The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. . . . The United States Supreme Court also emphasized that the *Bagley* test is not a sufficiency of evidence test. . . . A defendant need not demonstrate that after discounting the inculpatory evidence in light

of the undisclosed evidence, there would not have been enough left to convict. . . . One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (Citations omitted; internal quotation marks omitted.) *State* v. *Wilcox*, supra, 254 Conn. 454.

A

The Petitioner's Criminal Trial

In his underlying criminal trial, the petitioner asserted an alibi defense. The success of this defense, however, depended on the jury's believing that Raucci coerced the petitioner's January 16, 1991 statement, which placed the petitioner at the crime scene. The petitioner's position at trial was that his statement was coerced and not based on his personal knowledge but, rather, on information that was "fed" to him by Raucci.[3] The state discredited the petitioner's alibi defense through the testimony of two witnesses, Ruiz and Raucci.

At the petitioner's criminal trial, Ruiz testified that the petitioner and Lewis were business partners involved in the sale of drugs out of a Clay Street apartment in New Haven and that the petitioner and Lewis paid Turner to hold their drugs and cash for them. On the night of the homicides, Ruiz was at the Clay Street apartment and observed Lewis talking to the petitioner. Ruiz, the petitioner and Lewis then got into a rental car and drove slowly past Turner's apartment building, which was located on Howard Avenue.

---

[3] The petitioner did not testify at his criminal trial. The jury, however, through the testimony of his mother, Linda Morant, was made aware of his assertion that his January 16, 1991 statement was coerced. Linda Morant testified that "the policeman got [the petitioner] to say some things that [weren't] true."

After returning to the Clay Street apartment, some friends came over to watch television and to gamble. Jose Roque also came over with some girls, and Lewis gave him the keys to Lewis' car, a BMW, at which point Roque left with the girls. Soon after Roque returned with the BMW, most of the people at the Clay Street apartment left. Either Lewis or the petitioner asked Ruiz to retrieve two guns, a .357 caliber and a .38 caliber, and Ruiz complied. Ruiz, the petitioner and Lewis then got into the BMW and drove to Turner's apartment building. On the way to Turner's apartment building, the petitioner said that "whatever happens, keep it between the three of us." When they reached Howard Avenue, they stopped at the corner of Turner's apartment building, at which point Lewis and the petitioner exited the car with the guns, and Ruiz moved into the driver's seat and kept the motor running.

Shortly thereafter, Ruiz heard three gunshots. The petitioner and Lewis suddenly appeared. They threw an athletic bag full of drugs and a Community Chest bag containing money into the car and then got in. They ordered Ruiz to drive. As they were driving away, Lewis said: "Do you think I killed them? Do you think they're dead?" The petitioner responded: "Fuck it. . . . Whatever happened, happened." Ruiz asked the petitioner and Lewis what happened, but they did not answer him. Ruiz, the petitioner and Lewis eventually returned to Clay Street, and Ruiz was dropped off at his home.

A few weeks after the incident, Ruiz was playing basketball in a park on Chapel Street in New Haven with the petitioner and some other individuals. Lewis arrived at the park in his BMW. He opened up the trunk and removed a plastic bag, which Ruiz believed contained the .357 caliber gun "because you could tell by the long nose on the .357 . . . [and] by the way he was holding it . . . ." Lewis then threw the plastic bag into the river located next to the park.

Sometime after the park incident, Ruiz was arrested by Raucci pertaining to an unrelated matter. While being questioned about that matter, Ruiz told Raucci about the Howard Avenue homicides, which were unsolved homicides at that point. Ruiz gave a statement on January 14, 1991, in which he provided Raucci and Pettola, who was also present, with some information relating to the crime. In his January 14 statement, Ruiz stated that the petitioner and Lewis were involved in the sale of drugs and that Turner had held their money and drugs. He also stated that while at the Clay Street apartment one night, he overheard the petitioner and Lewis talking to Roque about the homicides, stating that they had shot Turner and another guy over some money. Lewis stated: "I shot [Turner] because he tried [to] run away with my money and my drugs." Then the petitioner said: "Well, you had to do what you had to do." Ruiz further provided in his statement that while he was playing basketball some time after the murders, he saw Lewis go to Lewis' gray BMW and take out a plastic bag, which appeared to have a gun in it, and throw the bag into the river. When Ruiz asked Lewis what was in the bag, Lewis responded that "it was just an old gun."

Ruiz testified at the petitioner's criminal trial that he intentionally left out his involvement in the homicides because he was "scared" and did not want to be charged with conspiracy. He also testified that Raucci did not force him to say anything that he included in the January 14, 1991 statement.

On May 28, 1991, Ruiz, accompanied by his attorney, gave a second statement to Raucci. In his statement, Ruiz provided additional information, including his involvement in the Howard Avenue homicides and a detailed chronology of the crime.

During the petitioner's criminal trial, Roque was called to testify by the state regarding a conversation

he overheard between the petitioner and Lewis in which they allegedly discussed the Howard Avenue homicides. Roque previously had provided details pertaining to that conversation in a statement given to Raucci on January 15, 1991, one day after Ruiz gave his statement and one day before the petitioner gave his statement. During his testimony, Roque stated that his January 15 statement was the product of Raucci's coercion. He testified that during the recording of his statement, Raucci manipulated the tape recorder and told him what to say in response to various questions. Roque stated several times that Raucci "kept stopping the tape" and would "tell [him] what to say and [then] . . . play the tape again." Moreover, Roque testified that Raucci threatened to "put [him] on a million dollars bond and charge [him] with [murder]."

Raucci also was called by the state to testify during the petitioner's criminal trial. During his testimony, Raucci rebutted Roque's testimony, claiming that he never threatened Roque or supplied him with any of the details of the crime. He also testified that he was not the investigator assigned to the case, that he did not know any of the particulars of the Howard Avenue homicides, beyond the few details Ruiz provided on January 14, 1991, until after he interviewed the petitioner on January 16, 1991, and that he, therefore, could not have given the detailed information of the crime to Roque or anyone else, including the petitioner.

## B

### The Hearing on the Petition for a New Trial

In May, 1995, Lewis received a letter from Ruiz stating that he falsely had implicated Lewis in the Howard Avenue homicides. Following receipt of the letter, Lewis contacted the Federal Bureau of Investigation (FBI), which conducted an investigation into the matter. As a result of the FBI investigation, the petitioner filed

a petition for a new trial that was based on a claim of newly discovered evidence.

The court, *Blue, J.*, presided over the proceedings relating to count one of the petitioner's fifth amended petition for a new trial; see footnote 1; in which the petitioner asserted that his January 16, 1991 statement was coerced and that two material witnesses, Ruiz and Raucci, gave false testimony at his criminal trial. As to the petitioner's claim that his January 16 statement was false and coerced, testimonial evidence, including that of the petitioner, was presented as well as a tape containing a recording of the defendant's January 16 statement, which was played for the court and admitted as a full exhibit. In its memorandum of decision following the proceedings, the court determined that, on the basis of the testimony presented and the court's observation of the tone and substance of the petitioner's tape-recorded statement, the petitioner's testimony that his January 16 statement was coerced and false was "not credible."

As to the petitioner's second claim that Ruiz and Raucci gave false testimony during the petitioner's criminal trial, the petitioner introduced testimonial evidence as well as information obtained during the FBI's investigation. After evaluating the evidence presented, the court, in its memorandum of decision, applied the standard articulated in *Pradlik* v. *State*, 131 Conn. 682, 41 A.2d 906 (1945), in accordance with *Johnson* v. *State*, 36 Conn. App. 59, 63, 647 A.2d 373, cert. denied, 231 Conn. 946, 653 A.2d 827 (1994), and determined that the petitioner had not met his burden of proof. Therefore, the court denied the petitioner's petition for a new trial.

C

The Habeas Trial

The petitioner asserted in his petition for a writ of habeas corpus that a *Brady* violation occurred because

the state suppressed favorable evidence possessed by Detectives Sweeney and Pettola. Specifically, the petitioner claimed that Sweeney and Pettola had evidence that Raucci had supplied critical details of the homicides, implicating the petitioner, to Ruiz and that Pettola had evidence regarding an unrelated incident that would have further impeached Raucci's credibility. The petitioner claimed that this evidence would have supported his contention at his criminal trial that his January 16, 1991 statement, which severely undermined his alibi defense at the trial, was coerced and false.

To support his contention, the petitioner called Pettola to testify. Pettola testified that on January 14, 1991, he was asked by Sweeney to sit in on the recording of Ruiz' statement. Sweeney explained that Raucci was interviewing a witness in the Howard Avenue homicides but gave him very little information beyond that. Pettola also briefly spoke to Raucci before the statement was recorded. Pettola recalled Raucci saying something to the effect that the witness, Ruiz, was prepared to admit that he was the "wheel man" in the Howard Avenue homicides. Pettola also stated that, while he was in the interview room with Ruiz and Raucci, Raucci conducted the interview professionally. Although he admitted that Raucci started and stopped the tape recorder, Pettola testified that he did not witness anything improper and that Raucci did not suggest answers to Ruiz. Pettola was not present prior to the recording of Ruiz' statement.

Pettola further testified that in September, 1996, he was interviewed by the FBI. An FBI report containing the substance of the interview was submitted as a full exhibit. The FBI report states: "Pettola also related an incident involving improprieties by Raucci that occurred in the late 1980s, when Pettola was assigned to the [s]treet [c]rime [u]nit [of the New Haven police department]. The specific incident involved himself, retired Detective Melvin Daniels and Raucci (when he

was a uniformed officer), during a motor vehicle stop of a known drug dealer in the [Fair Haven] section of New Haven, who they had confidential informant information was carrying a weapon. A search of the vehicle following the stop failed to reveal the expected weapon. After being advised that the weapon was not in the car, Raucci asked Pettola and Daniels if they wanted him to 'plant' a small amount of cocaine in the suspect's vehicle so they could arrest him. Raucci produced a bag of what appeared to be cocaine which he apparently had available for such purposes. [Daniels and Pettola] advised Raucci in no uncertain terms that they were not interested in 'planting' cocaine on this suspect. They then released the suspect but made no official report concerning Raucci's behavior."

The petitioner also moved, with the respondent's consent, to admit as a full exhibit, the testimony of Sweeney, which had been given at the petitioner's hearing on a petition for a new trial, in lieu of his live testimony. The habeas court granted the petitioner's request. The memorandum of decision pertaining to the hearing on the petition for a new trial issued by the trial court, *Blue, J.,* summarized Sweeney's testimony as follows: "Ruiz was arrested [pursuant to a warrant and brought to the detective division of the New Haven police department for questioning] on January 13, 1991. . . . Sweeney interviewed Ruiz alone for more than half an hour. . . . The questioning concerned the Turner-Fields homicides. Ruiz indicated that he knew nothing about the murders. At that point, Raucci arrived at the detective division. Sweeney and Raucci then jointly interviewed Ruiz. Ruiz once again stated that he knew nothing about the homicides. . . . Raucci then began giving Ruiz facts about the case. Sweeney thought that this was inappropriate and asked Raucci to step out of the room. Sweeney told Raucci not to tell Ruiz anything about the case, and Raucci agreed. The two

of them again confronted Ruiz. Raucci told Ruiz that he would let him go, although he was arrested on an arrest warrant, that he wanted Ruiz to tell him about the case, that he was driving the car that night and that it was in Ruiz' best interest to give a detailed statement. . . .

"At this point, Ruiz started changing his statement. At the same time, however, Raucci began to give Ruiz additional details. Raucci told Ruiz about the Clay Street house . . . and described the building. Raucci also described a scenario about guns in a gym bag. Sweeney took Raucci out in the hall a second time and told him to knock it off. . . .

"Sweeney became preoccupied with other matters. Raucci went back to confront Ruiz alone. After a period of time, Raucci emerged and reported that Ruiz wanted to give the whole case up. Sweeney then went in with Raucci to listen to Ruiz. Ruiz said that he had been driving the car that night. He further said that he had driven to Clay Street where they obtained two guns in a gym bag and then drove to Howard Avenue where [the petitioner] and his partner took the bag and went [into] the apartment. He heard [gun]shots. [The petitioner] and his partner came back to the car, and they drove off. . . .

"Sweeney told Raucci to step out of the room. . . . Sweeney then confronted Ruiz and asked him if he was telling the truth. Ruiz responded that he was not telling the truth and that the information that he had given had come from Raucci. After Sweeney reported this to Raucci, Raucci requested another interview with Ruiz. Raucci came out a short period of time later reporting that Ruiz [now just wanted to say that he had] 'overheard these two people talking about the case.' . . . [Thinking that this could in fact be true, Sweeney sent Raucci back to record the statement.]

"Sweeney's shift had now ended, and he was replaced by . . . Pettola. . . . Ruiz' tape-recorded statement was taken between 12:50 a.m. and 1:20 a.m. on January 14, 1991. . . . Sweeney did not witness that statement." (Citations omitted.)

On cross-examination, the state had Sweeney go through Ruiz' January 14 and May 28, 1991 statements line by line and point out those parts that consisted of information that Sweeney heard Raucci give to Ruiz. *Morant* v. *State*, supra, 68 Conn. App. 155. Sweeney identified several details that Raucci had suggested to Ruiz. Id. He agreed, however, that he did not hear Raucci suggest much of the information contained in Ruiz' statement. Id. Most significantly, Sweeney did not remember hearing Raucci tell Ruiz the names of the petitioner and Lewis. Id. Sweeney testified that no physical force was used and admitted that it was a standard police technique to give an interviewee some information with the expectation of receiving additional information in return, although he believed that Raucci was going "overboard" with the technique. Id. Moreover, Sweeney testified that there was nothing that occurred in January, 1991, that would indicate that Ruiz' statement was necessarily untruthful.

Finally, Ruiz was called to testify at the habeas proceedings. Ruiz, however, invoked his fifth amendment right against self-incrimination because the prosecutor would not agree to grant him immunity with respect to his role in the murders of Turner and Fields.

Upon the conclusion of the habeas trial, the court issued a memorandum of decision. With respect to the *Brady* claim, the court determined that "there was no suppression of material to establish a *Brady* violation. The material referred to, even if accepted as true, is such that it can hardly be described as favorable to the petitioner. This is a requirement for a *Brady* violation.

. . . This claim was raised by the petitioner in his earlier bids for a new trial. It was found wanting at both the trial and appellate levels. Like those courts, this court does not find it likely to have produced a different result on a retrial." (Citation omitted.)

## D

### Analysis

The petitioner claims that a *Brady* violation occurred because the evidence he presented through the testimony of Sweeney and Pettola challenges the reliability and truthfulness of the testimony of Ruiz and Raucci, which was used to discredit the petitioner's claim at trial that his January 16, 1991 statement was coerced, thereby severely crippling the petitioner's alibi defense. Again, more specifically, the petitioner claims that the testimony of Sweeney and Pettola shows that Raucci, contrary to his testimony at the criminal trial, supplied critical details of the homicides to Ruiz for Ruiz' January 14, 1991 statement and to the petitioner for his January 16, 1991 statement, which implicated the petitioner in the homicides, and that Ruiz then repeated those details in his trial testimony. In addition, the petitioner claims that the information contained in the FBI report provides further impeachment evidence as to Raucci. Thus, the petitioner claims that if he had had the testimony of Sweeney and Pettola and the information contained in the September, 1996 FBI report available at the criminal trial, it would have bolstered his claim that his January 16 statement was false and coerced, and eliminated any negative effect the statement had on his alibi defense.

As stated previously, "[t]o establish a *Brady* violation, the defendant must show that (1) the government suppressed evidence, (2) the suppressed evidence was favorable to the defendant, and (3) it was material [either to guilt or to punishment]." (Internal quotation

marks omitted.) *State* v. *Wilcox*, supra, 254 Conn. 452. The habeas court rejected the petitioner's claim that a *Brady* violation occurred, concluding that the petitioner failed to meet the requirements of all three prongs of the *Brady* test. If, however, the petitioner has failed to meet his burden as to one of the three prongs of the *Brady* test, then we must conclude that a *Brady* violation has not occurred. See *State* v. *Esposito*, 235 Conn. 802, 815, 670 A.2d 301 (1996).

After reviewing the testimony of Pettola and Sweeney in light of the petitioner's entire criminal trial, we determine that such evidence is not material in the *Brady* sense. In determining whether evidence is material for *Brady* purposes, "the focus is not whether, based upon a threshold standard, the result of the trial would have been different if the evidence had been admitted. We instead concentrate on the overall fairness of the trial and whether nondisclosure of the evidence was so unfair as to undermine our confidence in the jury's verdict. *United States* v. *Bagley*, supra, [473 U.S. 682]." *State* v. *Wilcox*, supra, 254 Conn. 454.

"It is well established that impeachment evidence may be crucial to a defense, especially when the state's case hinges entirely upon the credibility of certain key witnesses. . . . The rule laid out in *Brady* requiring disclosure of exculpatory evidence applies to materials that might well alter . . . the credibility of a crucial prosecution witness. . . . However, [e]vidence that may first appear to be quite compelling when considered alone can lose its potency when weighed and measured with all the other evidence, both inculpatory and exculpatory. Implicit in the standard of materiality is the notion that the significance of any particular bit of evidence can only be determined by comparison to the rest." (Citation omitted; internal quotation marks

omitted.) Id., 455. In this connection, it is important to the *Brady* calculus whether the effect of any impeachment evidence would have been cured by the rehabilitative effect of other testimony. *State* v. *Quintana*, 209 Conn. 34, 39, 547 A.2d 534 (1988).

The first difficulty with the petitioner's claim is that the evidence provided through the testimony of Sweeney and Pettola and the information contained in the FBI report does not pertain to the petitioner's January 16, 1991 statement and that any effect the evidence would have had on the statement would have been neutralized by the testimony of Detective Vaughn Maher. Although Maher did not testify at the petitioner's criminal trial, he did testify at a hearing regarding the suppression of the petitioner's January 16 statement, which was held before the petitioner's criminal trial. At the suppression hearing, Maher testified that the petitioner was brought to the police station to be interviewed. Initially, Sweeney was in the interrogation room along with the petitioner, Maher and Raucci but left before the taped portion of the statement commenced, thereby leaving only the petitioner, Maher and Raucci in the interrogation room. Maher testified that he did not observe any irregularities during the interview; the petitioner was only given the location and names of the victims; Raucci did not summarize any of the facts provided by Ruiz to the petitioner; the petitioner was not told what to say in his statement; and the petitioner was not threatened with arrest if he did not cooperate. On the basis of the foregoing, it is clear that the state would have been able to rehabilitate the evidence that the petitioner claims would have called into question the circumstances surrounding the taking of his January 16 statement; therefore, such evidence is not material. See id.

Next, the evidence, specifically the testimony of Sweeney and Pettola, does not materially impeach that

of Ruiz. Sweeney's testimony had no exculpatory value because it did not call into question Ruiz' identification of the petitioner as one of the perpetrators of the homicides. In fact, Sweeney testified that Raucci did not provide Ruiz with the names of the petitioner and Lewis during Ruiz' interview. Ruiz revealed those critical facts himself. In addition, Sweeney's testimony does not directly contradict Ruiz. At the petitioner's criminal trial, Ruiz testified that Raucci did not tell him what to say, and, although Sweeney claimed that Raucci provided Ruiz with a lot of information that he believed was improper, he never testified that Raucci told Ruiz that he had to make a statement and that he had to include specific facts stated in a particular way. Significantly, Ruiz' January 14, 1991 statement did not contain any of the critical facts, such as Ruiz' involvement in the crime, that Raucci allegedly supplied to him during the interview. Those facts were not provided until Ruiz gave his May 28, 1991 statement in the company of his attorney. Furthermore, Sweeney admitted that it was a standard police technique to give an interviewee some information with the expectation of receiving additional information in return. He also admitted that nothing occurred in January, 1991, that would indicate that Ruiz' statement was untruthful or that Ruiz was lying.

Pettola's testimony also does not contradict Ruiz' testimony at the petitioner's criminal trial that Raucci did not tell Ruiz what to say in the January 14, 1991 statement. Pettola admitted that he was not in the interview room prior to Ruiz' giving his statement. Pettola, however, was present during the recordation of Ruiz' January 14 statement and testified that he did not witness Raucci do anything improper. He further testified that, although Raucci started and stopped the tape recorder, Raucci did not suggest answers to Ruiz.

Finally, the evidence provided through the testimony of Sweeney and Pettola and the information contained

in the FBI report does not provide any meaningful impeachment evidence of Raucci. The petitioner asserts that the testimony of Sweeney and Pettola reveals that Raucci knew several details of the crimes before he interviewed Ruiz, contrary to Raucci's testimony at the petitioner's criminal trial that he was not investigating the double homicides and knew none of the facts surrounding the crime, and that Raucci was supplying details of the crime to Ruiz for Ruiz to provide in his January 14, 1991 statement. Moreover, the petitioner asserts that the FBI report shows that Raucci was "not above manufacturing evidence," having previously offered to plant cocaine in a suspect's car. This evidence, however, taken in context is merely cumulative impeachment evidence and, therefore, not material under *Brady*. See *State* v. *Wilcox*, supra, 254 Conn. 455 ("[w]e conclude that the impeachment value of the evidence was cumulative and, therefore, insufficient to render the [evidence] material according to the *Brady* and *Bagley* standards").

During the petitioner's criminal trial, Roque was called by the state to testify about a statement he gave to Raucci on January 15, 1991, in which he provided details about a conversation he overheard between the petitioner and Lewis regarding the Howard Avenue homicides. During his testimony, Roque stated that the statement he provided was the product of Raucci's coercion. Roque testified that Raucci manipulated the tape recorder and told him what to say in response to various questions. Specifically, Roque repeatedly testified that Raucci "kept stopping the tape" and would "tell [him] what to say and [then] . . . play the tape again." Roque further testified that Raucci threatened to "put [him] on a million dollars bond and charge [him] with [murder]."

Roque's testimony provided the jurors with direct evidence from which they could infer that Raucci knew many facts about the Howard Avenue homicides when

he interviewed Ruiz and the petitioner, was providing information to elicit the statement he wanted regardless of whether the statement was true, used improper tactics to elicit the statement and may have been untruthful when he testified that he knew none of the details of the crime prior to his interview with the petitioner. The evidence pertaining to the testimony of Sweeney and Pettola and the information contained in the FBI report, therefore, does not shed any additional light on Raucci's character or the circumstances surrounding Ruiz' statement. The petitioner was equipped with the necessary evidence to attack Raucci's credibility and the interview tactics that Raucci used in obtaining statements from Ruiz and the petitioner. Thus, the evidence provided through the testimony of Sweeney and Pettola and the information contained in the FBI report is merely cumulative and consequently not material under *Brady*.

On the basis of the foregoing, we conclude that the evidence provided through the testimony of Sweeney and Pettola and the information contained in the FBI report is not material. Accordingly, the petitioner's *Brady* claim fails.

## II

## INEFFECTIVENESS OF COUNSEL

The petitioner next claims that the habeas court improperly determined that he received effective assistance of counsel because his trial counsel failed to call as witnesses the petitioner and Christine Sorbin,[4] the petitioner's former girlfriend, during the petitioner's underlying criminal trial.[5] The petitioner asserts that

[4] Christine Sorbin is now known as Christine Maita; however, because both parties refer to her as Christine Sorbin, we will as well.

[5] The petitioner also claimed in his habeas petition that trial counsel was ineffective for failing to ask the petitioner's mother about a telephone bill; to cross-examine Maher and Raucci effectively; to investigate witness Millie Martinez; and to call Jeffrey Rochler, Lewis' employer, as a witness. Because these claims are not raised or briefed on appeal, they are deemed abandoned. See *State* v. *Ouellette*, 110 Conn. App. 401, 407 n.1, 955 A.2d 582, cert. granted on other grounds, 289 Conn. 951, 961 A.2d 417 (2008).

his testimony was necessary to support his claim that he was coerced into making a statement to police and that Sorbin's testimony would have corroborated his alibi. We disagree.

"When reviewing the decision of a habeas court, the facts found by the habeas court may not be disturbed unless the findings were clearly erroneous. . . . The issue, however, of [w]hether the representation a defendant received at trial was constitutionally inadequate is a mixed question of law and fact. . . . As such, that question requires plenary review by this court unfettered by the clearly erroneous standard." (Internal quotation marks omitted.) *Dwyer* v. *Commissioner of Correction*, 69 Conn. App. 551, 561, 796 A.2d 1212, cert. denied, 261 Conn. 906, 804 A.2d 212 (2002). To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "Because the petitioner must satisfy both prongs of the *Strickland* test to prevail on a habeas corpus petition, this court may dispose of the petitioner's claim if he fails to meet either prong." (Internal quotation marks omitted.) *Dwyer* v. *Commissioner of Correction*, supra, 560.

A

The Petitioner's Testimony

The petitioner first contends that the assistance of his trial counsel was ineffective because counsel failed to call the petitioner to testify in support of the claim that the January 16, 1991 statement was coerced. As to this claim, the court concluded that the petitioner was not a credible witness: "The petitioner's claim here is that he wanted to testify in support of his coercion claim but counsel delayed a decision on this point and argued against such action until it was too late. [Trial]

counsel testified that he and the petitioner discussed this question at length and [that] it was the petitioner's decision not to testify. Having heard the petitioner testify in this case and witnessing his censure of the assistant state's attorney representing the respondent at one point, it is highly unlikely that he would sit quietly while his turn to testify came and went." The court further determined that "a tactical decision was made with the petitioner's participation that he not testify." The court noted that the petitioner's courtroom behavior supported trial counsel's concern over the petitioner's testifying at trial and that cross-examination of the petitioner could have been a "total disaster," pointing out that the courts in three prior proceedings, including the hearing on the petitioner's petition for new trial, rejected the petitioner's assertion that the statement was coerced.

"This court does not retry the case or evaluate the credibility of the witnesses. . . . Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony." (Citation omitted; internal quotation marks omitted.) *Dwyer* v. *Commissioner of Correction*, supra, 69 Conn. App. 561–62. Accordingly, we will not disturb the court's determination that the petitioner was not a credible witness. The petitioner's first claim of ineffectiveness of counsel, therefore, must fail.

## B

### Sorbin's Testimony

Next, the petitioner asserts that he did not receive effective assistance of counsel because his trial counsel did not call Sorbin to testify in support of his alibi defense. During the petitioner's underlying criminal

trial, counsel had subpoenaed Sorbin to testify that she was with the petitioner in the Carolinas at the time of the crime. By the time the criminal trial began, however, Sorbin's and the petitioner's relationship had ended. Sorbin arrived at the courthouse, during the petitioner's criminal trial, accompanied by her attorney. The petitioner's trial counsel spoke with Sorbin's attorney and decided not to call Sorbin, although he could not remember the details of the conversation.

After hearing testimony from the petitioner's trial counsel and Sorbin, the court concluded that trial counsel's decision not to call Sorbin was a tactical decision. As the court pointed out, "when a subpoenaed witness appears with counsel, the moving party probably does not have a friendly willing witness." In addition, the court determined that Sorbin was not a strong witness, noting that when she testified at the habeas trial, "she was somewhat hesitant" and she "could not vouch for the statement she gave in 1994 to an investigator for the petitioner." Moreover, the court determined that Sorbin's testimony would have been cumulative, as other alibi witnesses were available.

"[O]ne cannot successfully attack, with the advantage of hindsight, a trial counsel's trial choices and strategies that otherwise constitutionally comport with the standards of competence." (Internal quotation marks omitted.) *Mitchell* v. *Commissioner of Correction*, 109 Conn. App. 758, 771, 953 A.2d 685, cert. denied, 289 Conn. 950, 961 A.2d 417 (2008). "The failure of defense counsel to call a potential defense witness does not constitute ineffective assistance unless there is some showing that the testimony would have been helpful in establishing the asserted defense." (Internal quotation marks omitted.) *Tatum* v. *Commissioner of Correction*, 66 Conn. App. 61, 66, 783 A.2d 1151, cert. denied, 258 Conn. 937, 785 A.2d 232 (2001). After reviewing the testimony presented at the habeas trial, we agree with

the court that trial counsel's decision not to call Sorbin was within the scope of reasonable trial strategy. Moreover, the petitioner has not shown how Sorbin's testimony would have been helpful to his defense. As the court noted, she was not a strong witness and other alibi witnesses were available. Thus, the petitioner's claim fails.

The judgment is affirmed.

In this opinion the other judges concurred.