ANTHONY SMALL *v.* STATE OF CONNECTICUT
(AC 32959)

Lavine, Alvord and Harper, Js.

Argued January 22—officially released July 2, 2013

*Anthony Small*, self-represented, the appellant (petitioner).

*Susann E. Gill*, supervisory assistant state's attorney, with whom, on the brief, was *John C. Smriga*, state's attorney, for the appellee (respondent).

*Opinion*

HARPER, J. The petitioner, Anthony Small, appeals following the denial of his petition for certification to appeal from the judgment of the trial court denying his petition for a new trial. On appeal, the petitioner claims that the court abused its discretion in denying his petition for certification to appeal and improperly denied his petition for a new trial, which was based on alleged newly discovered and/or suppressed evidence and an alleged unconstitutional jury charge.[1] We dismiss the appeal.

The petition for a new trial arises from the petitioner's underlying criminal case. Our Supreme Court previously has set forth the following facts that the jury reasonably could have found. "In October, 1990, the [petitioner] was involved in drug trafficking with his friend, Eric Amado. The [petitioner] and Amado stored drugs at the West Haven apartment of Amado's girlfriend, Joanne Bailey. Bailey shared the apartment with

[1] The petitioner also claims that the court improperly denied him his right to counsel in his petition for a new trial and on appeal. During the course of the proceedings on his petition, the petitioner filed various applications for the appointment of counsel, including appellate counsel, which were all denied by the court. This court already has concluded that the petitioner is neither statutorily nor constitutionally entitled to court-appointed counsel in an action on a petition for a new trial. See *Small* v. *State*, 101 Conn. App. 213, 217–19, 920 A.2d 1024 (2007), appeal dismissed, 290 Conn. 128, 962 A.2d 80, cert. denied, 558 U.S. 842, 130 S. Ct. 102, 175 L. Ed. 2d 68 (2009). Furthermore, this court already has held that the trial court did not otherwise abuse its discretion in denying the application for the appointment of appellate counsel. Id., 219–20. Likewise, we now hold that the court did not otherwise abuse its discretion in denying the applications for the appointment of counsel in the petition for a new trial.

Hope Vaughn, who had been dating the [petitioner]. . . . Vaughn, who was upset over statements regarding her allegedly made by the [petitioner] and Amado, decided that she would 'put a stop to it.' Vaughn telephoned a friend, Anthony Young, and asked him to come to the apartment she shared with Bailey. She then opened a window and knocked over some of the apartment's furnishings to make it appear as though the apartment had been burglarized. When Young arrived, Vaughn told him that she had some things to bring out and, after Young had backed his car, a red Toyota Celica, up to the door of the apartment building, she loaded two duffel bags and a small safe containing the drugs into the trunk of the car. The two then drove to Young's apartment in Bridgeport, where they were joined by Peter Hall, Vaughn's former boyfriend.

"Meanwhile, the [petitioner] and Amado returned to the West Haven apartment and discovered that the drugs were missing. The two men immediately began to search for the drugs and for whomever had taken them. They were joined in their search by Joanne Bailey, as well as by two associates, John 'John-John' Wideman and David 'Chico' Bailey. During the course of their search, the group traveled to Stamford so that Amado could consult with a 'voodoo man' of his acquaintance. The 'voodoo man' told him that Vaughn had taken the drugs. Joanne Bailey informed Amado that Vaughn might be with a friend, Sarita Malloy, who lived in Bridgeport with Young. The group drove in two cars to Young's apartment, where they found Vaughn, Young and Hall standing outside on the porch. At that time, they apparently did not suspect Young or Hall to have been involved in the theft. Joanne Bailey approached Vaughn and told her that Amado wanted to speak with her. Vaughn went over to the car where Amado was waiting, and when he ordered her to get into the car she complied. The group then returned to West Haven,

where they spent the night. Throughout the night, Amado and the [petitioner], along with the other two men, questioned Vaughn as to her knowledge of the missing drugs. Amado threatened to shoot her and, at one point, the [petitioner] tied a sock around Vaughn's head while David Bailey threatened her with a gun.

"The next morning, Joanne Bailey asked neighbors whether they had seen anything suspicious. After being told by a neighbor that Vaughn had been seen loading bags into the trunk of a red Toyota, the [petitioner], Amado, Joanne Bailey, Wideman and David Bailey returned to Young's Bridgeport apartment. The men were armed with automatic or semiautomatic weapons, including Uzis. The [petitioner] carried an Uzi. Upon arriving at Young's apartment, Amado told Young that he had come for his 'stuff.' Young told him to calm down and to come inside the house, but Amado began yelling and then began shooting. Young and Hall were fatally wounded, and Joanne Bailey was shot in the back of her left thigh. The [petitioner], Amado, Wideman and David Bailey fled the scene. The [petitioner] subsequently left the Bridgeport area, and moved to Queens, New York, where he remained until his arrest for the murders in 1994." *State* v. *Small*, 242 Conn. 93, 97–98, 700 A.2d 617 (1997).

This court previously has set forth the relevant procedural history with respect to the petitioner's criminal case. "In 1995, following a jury trial, the petitioner was convicted of capital felony in violation of General Statutes § 53a-54b (8), two counts of felony murder in violation of General Statutes § 53a-54c and conspiracy to commit robbery in the first degree in violation of General Statutes § 53a-134 (a) (2) and [General Statutes] § 53a-48. On appeal, our Supreme Court reversed the judgment in part and remanded the case to the trial court with direction to vacate the capital felony conviction and to impose a sentence on the felony murder

charges. . . . The trial court thereafter imposed a total effective sentence of forty-five years incarceration." (Citation omitted.) *Small* v. *State*, 101 Conn. App. 213, 215, 920 A.2d 1024 (2007), appeal dismissed, 290 Conn. 128, 962 A.2d 80, cert. denied, 558 U.S. 842, 130 S. Ct. 102, 175 L. Ed. 2d 68 (2009).

On May 3, 2001, the petitioner filed a revised petition for a new trial pursuant to General Statutes § 52-270 and Practice Book § 42-55, in which he alleged: (1) actual innocence on the basis of newly discovered evidence; (2) that the state failed to disclose exculpatory evidence; and (3) that the trial court provided an unconstitutional jury charge on consciousness of guilt. "On July 7, 2006, the court denied the petitioner's request for a new trial. Thereafter, the petitioner filed a petition for certification to appeal [pursuant to General Statutes § 54-95 (a)]. . . . The court . . . denied the petition for certification to appeal on the ground that there were no questions involved that merited review by an appellate court." Id. This appeal followed.

The petitioner claims that the court abused its discretion in denying his petition for certification to appeal. "As a preliminary matter, we identify the standard of review. It is well established that we apply the abuse of discretion standard when reviewing a court's decision to deny a request for certification to appeal from a denial of a petition for a new trial. . . . In determining whether a court abused its discretion in this context, we apply the criteria set forth in *Lozada* v. *Deeds*, 498 U.S. 430, 431–32, 111 S. Ct. 860, 112 L. Ed. 2d 956 (1991). . . . According to the *Lozada* framework, a petitioner can establish a clear abuse of discretion by demonstrating one of the following criteria: (1) that the issues are debatable among jurists of reason; (2) that a court could resolve the issues in a different manner; or (3) that the questions are adequate to deserve encouragement to proceed further." (Citations omitted.) *Daniels* v. *State*,

88 Conn. App. 572, 575–76, 870 A.2d 1109, cert. denied, 274 Conn. 902, 876 A.2d 11 (2005).

The petitioner claims that the court abused its discretion in denying his petition for certification to appeal because he has presented issues that warrant appellate consideration.

I

The first issue concerns whether the court improperly denied his petition for a new trial in light of the alleged newly discovered and/or suppressed evidence. In particular, the petitioner claims that the court erred by concluding that the evidence presented was not material and not likely to produce a different result in a new trial.

"At the outset, we note that a petition for a new trial is addressed to the discretion of the trial court whose decision thereon will be set aside on appeal only if it reflects a clear abuse of discretion. . . . In deciding upon a petition for a new trial, the function of the trial court is to determine whether the evidence presented at the hearing on the petition together with the evidence presented at the original trial warrants the granting of the petition. . . . The basic question which the trial court has to decide is whether upon all the evidence an injustice had been done . . . and whether it is probable that on a new trial a different result would be reached." (Citations omitted; internal quotation marks omitted.) *Demers* v. *State*, 209 Conn. 143, 148–49, 547 A.2d 28 (1988); see also *Asherman* v. *State*, 202 Conn. 429, 434, 521 A.2d 578 (1987).

As previously mentioned, in his revised petition for a new trial, the petitioner alleged actual innocence on the basis of newly discovered evidence and the claim that the state failed to disclose exculpatory evidence. There are separate standards that govern each claim.

See *Demers* v. *State*, supra, 209 Conn. 150 (setting forth standard for suppressed evidence in petition for new trial); *Asherman* v. *State*, supra, 202 Conn. 434 (setting forth standard for newly discovered evidence in petition for new trial). In support of his claims, the petitioner relies on certain documents he obtained through a freedom of information request directed to the Federal Bureau of Investigation (FBI documents) that were attached to his revised petition and admitted into evidence during the hearing. The petitioner further relies on documents he obtained from his parole report (parole documents) that also were admitted into evidence during the hearing. The petitioner repeatedly asserted that both the FBI documents and the parole documents had been suppressed by the state but appeared to assert that only the FBI documents were newly discovered. Nevertheless, the court treated the FBI documents under the standard for newly discovered evidence and the parole documents under the standard for suppressed evidence, and ultimately concluded that the evidence presented was not material and not likely to produce a different result in a new trial.

At the outset, we recognize that the test for materiality varies depending upon the standard employed. Compare *Shabazz* v. *State*, 259 Conn. 811, 823, 792 A.2d 797 (2002) (newly discovered evidence must *"probably*, not merely possibly, result in a different verdict at a new trial" [emphasis added; internal quotation marks omitted]) with *State* v. *Wilcox*, 254 Conn. 441, 453–54, 758 A.2d 824 (2000) (suppressed evidence is material "if there is a *reasonable probability* that, had the evidence been disclosed to the defense, the result of the proceeding would have been different" [emphasis added; internal quotation marks omitted]). The difference is not mere semantics. For newly discovered evidence, "[i]t is not sufficient for [the petitioner] to bring in new evidence from which a jury *could* find him not guilty—

it *must be evidence which persuades the judge that a jury would find him not guilty*." (Emphasis in original; internal quotation marks omitted.) *Shabazz* v. *State*, supra, 823. For suppressed evidence, however, "a showing of materiality *does not require demonstration by a preponderance* that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." (Emphasis added; internal quotation marks omitted.) *State* v. *Wilcox*, supra, 454. Therefore, in an abundance of caution, and in light of the record, we address both the FBI documents and the parole documents under the less strict standard of materiality for suppressed evidence.[2]

"It is well established that suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. [*Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)] . . . . To establish a *Brady* violation the defendant bears the burden of demonstrating: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that it was material." (Citations omitted; internal quotation marks omitted.) *Demers* v. *State*, supra, 209 Conn. 149–50.

"Evidence that is not disclosed is suppressed for *Brady* purposes even when it is known only to the police investigators and not to the prosecutor. . . . In addition, evidence is favorable if it is either exculpatory or impeaching." (Citation omitted; internal quotation marks omitted.) *Morant* v. *Commissioner of Correction*, 117 Conn. App. 279, 285, 979 A.2d 507, cert. denied, 294 Conn. 906, 982 A.2d 1080 (2009). "The test for materiality is well established. The United States Supreme

---

[2] We do so because the petitioner repeatedly asserted that both the FBI documents and the parole documents were suppressed.

Court . . . in *United States* v. *Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985), [held] that undisclosed exculpatory evidence is material, and that constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. . . . The court explained that a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. . . . The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Wilcox*, supra, 254 Conn. 453–54.

"In evaluating the reasonable probability standard, we should be aware of what adverse effect the nondisclosure may have had on the defendant's preparation or presentation of his case and that we should act with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have [otherwise] taken . . . . On the other hand, we must also recognize that the mere *possibility* that an item of undisclosed evidence *might* have helped the defense or *might* have affected the outcome of the trial, however does not establish materiality in the constitutional sense." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Ortiz*, 252 Conn. 533, 546, 747 A.2d 487 (2000).

The following additional facts are relevant to our consideration of this issue. At his criminal trial, the petitioner testified to the following. As a result of a car accident that had occurred previously, he had a doctor's

appointment on October 18, 1990, the date that he and Amado discovered the theft, but he did not attend the appointment in order to clear his name of any involvement in the theft, as Amado indicated that he would be questioning everybody who came to the house. He traveled with Amado throughout the day as Amado attempted to learn who had committed the theft. Amado never indicated what was stolen other than his "money" or his "stuff." At night, the petitioner, Joanne Bailey, David Bailey, Wideman and Vaughn were questioned by Amado. At one point, Amado pulled out a gun and pointed it at Vaughn. David Bailey also threatened Vaughn with a gun. The next day, the six of them traveled to Young's apartment. The petitioner did not know whether Amado had a gun at that time and did not believe anything was going to happen other than questioning. The petitioner did not have a gun himself. The petitioner stayed outside by the fence and, when he heard gunshots fired, he ran. The petitioner had no intention to commit a robbery. Although he fled the scene of the shootings, he did not leave Bridgeport until later when he started receiving threats from police. In particular, the police came to the home of the petitioner's mother at 4 a.m. and threatened to kill the petitioner in front of her and indicated that the petitioner had a bulletproof vest, an Uzi, and that he had shot three people, killing two of them. Thereafter, the petitioner left Bridgeport for Queens, New York. The petitioner also testified that he was selling jewelry at about the time of the shootings.

Our Supreme Court previously has indicated that "[i]t was undisputed that the [petitioner] did not shoot the victims and that he did not personally attempt to take any property from them. There was conflicting testimony, however, regarding the extent of the [petitioner's] participation in the other activities leading up to the shootings. Although the [petitioner] testified that

he was never armed, both Joanne Bailey and Vaughn testified that they believed that he had been carrying a gun, which Vaughn described as an Uzi. Additionally, Vaughn testified that the drugs taken from the apartment belonged to both Amado and the [petitioner]. Vaughn further testified that the [petitioner] had taken part in questioning and threatening her the night before the shootings." State v. Small, supra, 242 Conn. 106–107. In particular, Vaughn testified that the petitioner tried to tie a sock around her head. Furthermore, "[t]he [petitioner] himself testified that Amado had a gun and that he was afraid of what might have happened to him or his family if Amado had thought he had taken the missing property. When asked to elaborate on his fears, he stated that, in his experience, such situations most of the time [end] up in somebody gettin' killed." (Internal quotation marks omitted.) Id., 107.

During the hearing, the petitioner submitted the FBI documents and the parole documents into evidence. The documents indicate a wide array of information about the petitioner's parole history and the FBI's investigation into the whereabouts of the petitioner after the shootings from which we glean the following as the crux of the petitioner's claim. The parole documents indicate various statements made by the petitioner to his parole officer before the shootings concerning a car accident, doctor's appointments and his own business selling gold. The parole documents also indicate that, on November 19, 1990, the petitioner reported to his parole officer. The FBI documents indicate that members of the Bridgeport Police Department conducted interviews of relatives and associates of the petitioner and surveillance of his last known address. Various FBI documents indicate that the petitioner was known to wear a bulletproof vest, carry automatic weapons and was armed and dangerous. Other FBI documents indicate that the petitioner was involved in a double or

triple homicide and use the phrases, "drug related weapon Uzi," and "willful kill-gun . . . ." A letter, dated June 24, 1991, indicates that the petitioner was in the New Haven-Bridgeport area and was also wanted by the New Haven Police Department in connection with a recent homicide in that city.

At the hearing on the petition, Lawrence Hopkins, the petitioner's attorney in his criminal trial, testified that he did not have the parole documents in his possession at the time of the criminal trial, that he should have had the documents and that he would have offered the documents to show that the petitioner was in Connecticut on November 19, 1990. Parole Officer Anndean Kmetz testified, however, that the petitioner reported regularly up until the shootings, but only once thereafter, with an unscheduled visit on November 19, 1990.

Special Agent Martin L. McCullough II of the FBI testified that there may have been some discrepancies and misstatements in the FBI documents, but that any mistakes would not have impacted the investigation because the information in the FBI documents primarily stays within the FBI's control "within the investigative file simply to document what investigation has taken place . . . ." McCullough further testified that he had no personal knowledge about the information in the documents, other than what had been relayed to him, such as the whereabouts of the petitioner or that the petitioner was armed and dangerous with automatic weapons and a bulletproof vest. McCullough testified that he relayed the information in a caution statement "so that the agents or other officers that are on the opposite end of this investigation are aware that the individual is considered armed and dangerous, weapons that he may use, he or she may use, have been known to use, and if bulletproof vests or other items would have been used by that individual." In any event, Hopkins testified that he would not have admitted the FBI

documents at trial for any reason, including the reason that they corroborated the petitioner's testimony that he fled because he was being characterized by police in a certain manner, as the documents were not particularly probative and were "inflammatory on their face."

The court concluded "that there is no reasonable probability that the disclosure of the parole [documents] would have affected the outcome of the trial." The court noted that "[a]t the original trial, the jury heard testimony from Joanne Bailey and . . . Vaughn. . . . Although conflicting at times, both testified that the petitioner was carrying a weapon, which Vaughn described as an Uzi. . . . Vaughn further testified that the petitioner had questioned and threatened her the night before the shooting. . . . Additionally, the petitioner testified he was at the scene unarmed . . . and fled the Bridgeport area after the incident. . . . In the court's view, the jury could have disregarded the testimony of Vaughn and Bailey and believed the petitioner." (Citations omitted.)

In light of this apparent credibility contest, the court concluded that "[e]vidence that the petitioner worked and visited a doctor on or about the time of the shooting is not material and it is not likely to have produced a different result." The court further noted that "after October 19, 1990, outside of several phone calls, the petitioner made only one scheduled appearance at Kmetz' office." "[T]he petitioner admitted fleeing the scene of the shooting and leaving the state to [go to] New York, where he was arrested several years later. In the court's view, this testimony, considered with his parole history, would have permitted the jury to draw a stronger inference of consciousness of guilt and would, therefore, not have changed the outcome of the case." Although the court considered the FBI documents under the standard for newly discovered evidence, the court credited Hopkins' testimony and, with respect

thereto, concluded that "[i]f these documents had been admitted at trial, it is likely they would have had a detrimental impact on the petitioner's case." Ultimately, the court concluded that the evidence presented was not material and not likely to produce a different result in a new trial.

The petitioner argues that the evidence presented was material to his credibility, would have supported the defense of duress, which was not raised at trial, and would have negated the charge on consciousness of guilt concerning his flight from the state. We are not persuaded.

The court properly reviewed the evidence offered in support of the petition for a new trial in conjunction with the evidence presented at the criminal trial. We conclude that the first issue presented by the petitioner with respect to the materiality of the FBI documents and the parole documents, regardless of the standard applied, is not debatable among jurists of reason, that a court could not properly resolve the issue in a different manner and that it is not adequate to deserve encouragement to proceed further. Accordingly, with respect to this issue, we conclude that the court did not abuse its discretion in denying the petition for certification to appeal.

II

The second issue concerns whether the trial court improperly denied the petition for a new trial in light of the alleged unconstitutional jury charge. In particular, the petitioner claims that the court erred by failing to find the charge given to the jury on flight unconstitutionally defective and in violation of his due process rights.

At the outset, we note that a petition for a new trial "does not furnish a substitute for, or an alternative

to, an ordinary appeal but applies only when no other remedy is adequate and when in equity and good conscience relief against a judgment should be granted. . . . The procedure is not intended to reach errors available on appeal of which the party should have been aware at the time when an appeal might have been taken. . . . The salutary purpose of the statute is that if a party has a meritorious defense and has been deprived of reasonable opportunity to present it, he ought to be permitted to make it upon another trial." (Internal quotation marks omitted.) *State* v. *Grimes*, 154 Conn. 314, 325, 228 A.2d 141 (1966). The petitioner has not presented, nor are we aware of, any authority that has permitted a challenge to a jury charge to be raised in a petition for a new trial. Ultimately, a challenge to a jury charge is not properly raised in a petition for a new trial because the petitioner had the opportunity at his criminal trial and/or on direct appeal to raise such a challenge.[3] To the extent that newly discovered and/or suppressed evidence would affect the court's decision to give a jury charge or affect the jury's consideration thereof, the propriety of a new trial is considered under the standards for newly discovered and/or suppressed evidence. As we previously have indicated, there is no issue with respect to the materiality of the FBI documents or the parole documents, including as they relate to the charge on consciousness of guilt.

---

[3] The petitioner claims that the jury charge constitutes structural error. We disagree. "Structural [error] cases defy analysis by harmless error standards because the entire conduct of the trial, from beginning to end, is obviously affected . . . . These cases contain a defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. . . . Such errors infect the entire trial process . . . and necessarily render a trial fundamentally unfair . . . . Put another way, these errors deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair." (Internal quotation marks omitted.) *State* v. *Latour*, 276 Conn. 399, 410, 886 A.2d 404 (2005).

We conclude that the second issue presented by the petitioner with respect to the propriety of the jury charge is not debatable among jurists of reason, that a court could not properly resolve the issue in a different manner and that it is not adequate to deserve encouragement to proceed further. Accordingly, with respect to this issue, we conclude that the court did not abuse its discretion in denying the petition for certification to appeal.

The appeal is dismissed.

In this opinion the other judges concurred.